OPINION
JANICE M. HOLDER, J.,
delivered the opinion of the court,
in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON, and WILLIAM M. BARKER, JJ, joined.
James Henderson Dellinger and Gary Wayne Sutton were convicted of first degree premeditated murder in the death of Tommy Mayford Griffin. Dellinger and Sutton were both sentenced to death, and the Court of Criminal Appeals affirmed their convictions and sentences. We entered an order designating the following issues for oral argument:[1] 1) whether the indictments violate the United States Constitution as construed in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); 2) whether the trial court erred in refusing to grant the defendants a severance or to grant separate juries for each defendant; 3) whether the trial court erred in dismissing the jury selection expert previously granted the defendants; 4) whether the trial court erred in refusing to suppress evidence seized from Dellinger’s residence under a search warrant; 5) whether the evidence supports the jury’s finding of aggravating circumstance (i)(2); 6) whether the trial court erred in failing to instruct the jury at sentencing that the identity of the defendants in prior convictions must be proven beyond a reasonable doubt; 7) whether the trial court erred in refusing to charge the jury as a mitigating factor that the defendants are human beings; 8) whether the trial court erred in refusing to answer the jury’s question about the manner of serving life sentences; and 9) whether the sentences of death are excessive or disproportionate under Tenn.Code Ann. § 39-13-206(c)(l)(D). Having carefully reviewed these issues and the remainder of the issues raised by Dellinger and Sutton, we find no merit to their arguments.[2] Accordingly, we affirm the Court of Criminal Appeals in all respects.
FACTUAL BACKGROUND
On the afternoon of February 21, 1992, Dellinger, Sutton, and Griffin spent several hours at Howie’s Hideaway Lounge (How-ie’s) on Highway 321 in Maryville, Tennessee. The three men drank beer and played pool until approximately 7:00 p.m., when they left the bar in a dark-blue Camaro. Witnesses testified that there was no evidence of hostility among the men while they were in the bar.
Around 7:00 p.m. Cynthia and Kenneth Walker were traveling north on Alcoa *463 Highway near the Hunt Road exit. They observed three men who appeared to be fighting in a dark-colored Camaro on the side of the road. Two of the men were standing outside of the car attempting to forcibly remove the third man from the back seat. Kenneth Walker used his portable radio to report the incident to the dispatcher for Rural Metro Blount County Ambulance.
Sharon Davis, who was also driving north on Alcoa Highway around the same time, observed a shirtless and shoeless man stumbling down the side of the road near the Hunt Road exit. When Davis passed the same area about thirty or forty minutes later, she saw two men standing outside of a dark-colored Camaro on the side of the road. They appeared to be looking for something.
At 7:11 p.m. Sandra Hicks, a dispatcher for Blount County 911, received a complaint about an altercation involving three men in a dark Camaro at the intersection of Alcoa Highway and Hunt Road. Officer Steve Brooks with the Alcoa Police Department was dispatched to the scene. While making an unrelated traffic stop, Officer Brooks noticed a vehicle with flashing headlights parked on the side of Hunt Road. The officer sent his backup, Officer Drew Roberts, to investigate. Officer Roberts found two men, not Dellinger and Sutton, standing next to a pickup truck. A shirtless man sitting on the bed of the truck identified himself as Griffin. Griffin told the officer that his friends had put him out of a car. Griffin would not identify his friends or tell the officer what had happened. Officer Roberts arrested Griffin for public intoxication. Griffin was booked at the Blount County jail at 7:40 p.m. Dellinger arrived about forty-five minutes to an hour later to ask about Griffin’s release. Sergeant Ray Herron explained to Dellinger that department policy required a minimum four-hour detention for public intoxication and advised him to come back at 10:80 or 11:00 p.m.
Alvin Henry was a resident of Bluff Heights Road, where Dellinger and Griffin both lived. At approximately 9:00 p.m., Henry looked out of his trailer window and saw Dellinger’s white Dodge pickup truck. Henry saw someone enter the passenger side of the truck. The truck drove up the road and pulled into Dellinger’s driveway. Henry then noticed fire shooting from Griffin’s trailer down the road. Henry’s wife reported the fire to the 911 operator at 9:02 p.m. Arson investigator Gary Clabo concluded that the fire was set intentionally with the use of a liquid-type accelerant and an open flame such as a match, candle, or cigarette lighter.
Jennifer Branam, Griffin’s niece, ran to Dellinger’s trailer when she learned that Griffin’s trailer was on fire. Just as Del-linger’s wife was telling Jennifer that Del-linger was not home, Dellinger and Sutton walked down the hall from the living room. The two men were still wearing their jackets, and their pants were wet up to the knees. Jennifer asked them if Griffin was in his burning trailer, and Sutton told her that Griffin was in Blount County with a girl. When Jennifer asked the men to accompany her to the trailer, Dellinger responded that they were already in enough trouble.
After returning home, Jennifer looked out the window and saw Dellinger remove an object wrapped in a sheet from his truck and place it into the back of his wife’s Oldsmobile. Jennifer testified that the object resembled a shotgun. Herman Lewis, a relative of Jennifer, also observed Dellinger moving an object from his truck to his wife’s car shortly after 10:00 p.m. Dellinger and Sutton then left in the Oldsmobile.
*464 At around 11:25 p.m. Dellinger and Sutton returned to the Blount County jail. Dellinger paid a cash bond for Griffin. Officers in the jail lobby overheard one of the defendants tell Griffin that they needed to get him back to Sevier County. At 11:55 p.m. Jason McDonald and his mother, Brenda McKeehan, heard two gunshots fired from an area on the Little River in Blount County called the Blue Hole. The Blue Hole is approximately five hundred yards down the hill from McDonald’s residence.
The next morning, February 22, Jennifer Branam saw Dellinger leave his trailer, remove the object he had placed in his wife’s car the night before, and place the object under his trailer.
Around noon on February 22, Connie Branam, Jennifer’s mother and Griffin’s sister, informed her daughter Sandy of her intent to go to Blount County to look for Griffin. At about 2:00 p.m., Connie Bra-nam went to Jerry Sullivan’s grocery store in Townsend asking if anyone had seen her brother. Sullivan then saw Branam speaking with two men in a white Dodge pickup truck in the grocery store parking lot.
Later that afternoon, Connie Branam accompanied Dellinger and Sutton to How-ie’s. Branam told Jamie Carr, who worked as the afternoon bartender at Howie’s, that she was looking for her brother. Responding to Dellinger’s questioning, Carr repeatedly told them that she remembered Dellinger, Sutton, and Griffin from the night before. When Dellinger asked if Carr remembered with whom Griffin left, she responded that they were still at the bar when her shift ended. Del-linger told Carr that they last saw Griffin with a short, dark-haired, ugly woman. When Carr’s shift ended at 5:00 p.m. on February 22, Branam, Dellinger, and Sutton were still drinking beer in the bar.
Terry Lilly Newman worked the shift following Carr’s at Howie’s. When she approached Branam, Dellinger, and Sutton to ask if they needed anything, Dellinger asked Newman if she remembered them from the night before. Newman responded that she recalled seeing Dellinger and Sutton with another man drinking beer and playing pool. Branam explained that she was looking for her brother and asked with whom he had left the bar. Newman became confused because she knew that Griffin had left with Dellinger and Sutton. Dellinger asked Newman if she remembered them returning to Howie’s after they bailed Griffin out of jail, but Newman knew that the three had not returned to Howie’s because she had worked until closing. After unsuccessfully attempting to convince Newman to join them in their search for Griffin, Sutton asked Newman if she was married. When Newman responded that she was married, Sutton stated, “[WJell, your husband is going to be surprised whenever you’re missing one morning, when he wakes up and you’re missing.” Dellinger, Sutton, and Branam left Howie’s around 6:30 p.m.
About 8:00 p.m. that night, James and Barbara Gordon observed a fire in the woods near the Clear Fork area of Sevier County. The following morning, Barbara Gordon watched a white truck occupied by two men leave the woods and head toward the main road. She testified that the truck was traveling rapidly and that it came from the general area where they had observed the fire the night before.
On Monday, February 24, around 3:30 p.m. Griffin’s body was discovered lying face-down on a bank at the Blue Hole. He had been shot in the back of the neck at the base of the skull with a shotgun. Two 12-gauge shotgun shell casings and beer cans were found near the body. The shotgun shells were fired from the same gun *465 that fired shells later found in Dellinger’s yard. Forensic pathologist Dr. Charles Harlan opined that Griffin had died between 6:00 p.m. on February 21 and 8:00 a.m. on February 22. Dr. Eric Ellington with the Blount County Medical Examiner’s Office conducted the autopsy on Griffin’s body. He concluded that the cause of death was the destruction of the brain stem from the shotgun wound. Ellington retrieved two metal pellets and two pieces of shotgun wadding from Griffin’s brain. The pellets were consistent with pellets loaded in the 12-gauge “00” buckshot casings found near Griffin’s body.
On Friday, February 28, Connie Bra-nam’s body was discovered in her burned vehicle in the wooded area where the Gor-dons had observed the fire on February 22. Arson investigator Gary Clabo determined that the fire had been set by human hands, started by an outside ignition source with the use of an accelerant. Bra-nam’s body was so badly burned that forensic anthropologist Dr. William Bass was unable to determine the cause or time of death. Dental records were necessary to identify the body. Investigators discovered a rifle shell in the burned vehicle that had been fired from the .303 rifle later found in Dellinger’s trailer.
Based upon the above evidence, the jury convicted Dellinger and Sutton of the first degree premeditated murder of Griffin. At the penalty stage, the State presented evidence that Dellinger and Sutton were previously convicted of first degree premeditated murder in Sevier County in 1993.[3] The State also presented proof that Sutton was convicted of aggravated assault in Cobb County, Georgia in 1983.
The defense presented mitigation witnesses, including family members, friends, acquaintances, and clinical psychologists. Dellinger presented proof that he was raised in a large family with eight children. His parents were loving but were harsh disciplinarians, and his family was very poor. Dellinger left school when he was ten years old and never learned to read or write. He became a carpenter, and testimony showed that he was a good employee until 1990 when he sustained a back injury that forced him to quit working. Dellinger has four children and two stepchildren from his two marriages. Two of his children had died tragically — an eighteen-year-old daughter died in a car accident, and a fifteen-month-old son died when a stove fell on him. Dellinger presented evidence that he is a non-violent, religious, helpful, and kind-hearted man. He had been a well-behaved prisoner and had prevented another prisoner from committing suicide. Clinical psychologist Dr. Peter Young testified that Dellinger has an IQ between 72 and 83 and has borderline personality disorder. He related that due to a lack of family nurturing Dellinger is distrustful of others. Young testified that although Dellinger is not violent he is capable of “flaring up” when drunk and angry. Young opined that Dellinger would do well in a structured prison environment.
Sutton presented evidence showing that he had been a good employee and a well-behaved prisoner. His parents divorced when he was a toddler, and he dropped out of school in the eighth grade. Sutton has one daughter, and witnesses testified that he gets along well with children. Witnesses also testified that he is a generous man and a good family man who provided assistance to his sister-in-law and her son when his sister-in-law had surgery. He also saved his niece’s life by rescuing her from a fire. Sutton is a good artist. He draws well and makes woodwork items as gifts and to earn money. Sutton’s brother *466 testified that the aggravated assault conviction was based upon an incident in which Sutton was merely present when his brother fired a gun into a car and the bullet bounced into a mobile home and struck a woman in the leg.
Clinical psychologist Dr. Eric S. Engum testified that Sutton’s IQ is between 77 and 83. His intellect, social judgment, abstract reasoning, and vocabulary are limited. Engum related that Sutton had suffered undiagnosed learning disabilities. Sutton’s father was an alcoholic, and Sutton began abusing alcohol at the age of twelve. Sutton suffered mental and physical abuse due to the conflict between his parents and learned distrust of others at an early age. Engum stated that Sutton self-anesthetized through the use of alcohol and marijuana. Engum diagnosed Sutton with a depressive disorder and a mixed personality disorder with passive/aggressive and anti-social features. Engum opined that prison would be a good environment for Sutton.
The jury returned its verdict, finding the (i)(2) aggravating circumstance, that the defendants were previously convicted of a felony whose statutory elements involve the use of violence to the person. Tenn. Code Ann. § 39 — 13—204(i)(2). The jury found that this aggravating factor outweighed any mitigating circumstances and sentenced Dellinger and Sutton to death.
CONSTITUTIONALITY OF THE INDICTMENTS
Dellinger and Sutton challenge the constitutionality of their indictments based upon the recent United States Supreme Court decisions in Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In Jones, the Court construed a federal statute and noted that the constitutional guarantees of due process, notice, and trial by jury require that any fact, other than a previous conviction, used to enhance a sentence above the statutory maximum must be: 1) charged in the indictment, 2) submitted to the jury, and 3) proven beyond a reasonable doubt. Jones, 526 U.S. at 243, n. 6, 119 S.Ct. 1215. In Apprendi, the Court held that the Fourteenth Amendment extends these requirements to cases involving state statutes. Apprendi, 530 U.S. at 476, 120 S.Ct. 2348. Dellinger and Sutton maintain that the indictments in this case failed to comply with the Apprendi requirements because the indictments did not contain any facts concerning the Branam murder, which was used as an aggravating factor during sentencing.
The defendants’ argument fails for multiple reasons:
1. The specific aggravating factor used to impose the death penalty in this case was a prior conviction. The Apprendi holding applies to enhancement factors other than prior convictions. Id. at 476, 120 S.Ct. 2348. The aggravator relied upon by the State here is therefore specifically excluded under Apprendi.
2. The death penalty is within the statutory range of punishment prescribed by the legislature for first degree murder. Tenn.Code Ann. § 39-13-202(c)(l). The Apprendi holding applies only to enhancement factors used to impose a sentence above the statutory maximum. Apprendi, 530 U.S. at 481, 120 S.Ct. 2348. It is on this basis that the Court in Apprendi addressed and rejected the concern that the principles governing its decision would invalidate state capital sentencing procedures requiring judges to find aggravating factors before imposing the death penalty. Id. at 496-97, 120 S.Ct. 2348. The Court noted that such a sentencing procedure does not allow a judge to determine the *467 existence of a factor making the crime a capital offense. Id. at 497, 120 S.Ct. 2348. Instead, the judge is called upon to decide whether the death penalty, the maximum penalty allowable under the capital statute, should be imposed. Id.
3. District attorneys in Tennessee are required to notify capital defendants no less than thirty days before trial of the intent to seek the death penalty and must specify the aggravating circumstances upon which the State intends to rely during sentencing. Tenn. R.Crim. P. 12.3(b). Rule 12.3(b) therefore satisfies the requirements of due process and notice. See State v. Golphin, 352 N.C. 364, 395-97, 533 S.E.2d 168 (2000) (statute setting forth the aggravating circumstances the jury may consider provides sufficient notice to satisfy the constitutional requirements of due process).
4. Tennessee’s capital sentencing procedure requires that a jury make findings regarding the statutory aggravating circumstances. TenmCode Ann. § 39-13-204(f)(1), (i). The Apprendi holding applies only to sentencing procedures under which judges sentence the defendants. Apprendi, 530 U.S. at 476, 120 S.Ct. 2348.
5. Tennessee’s capital sentencing procedure requires that the jury find any statutory aggravating circumstance beyond a reasonable doubt. TenmCode Ann. § 39 — 13—204(f)(1), (i). The Tennessee statutes therefore comply with the “beyond a reasonable doubt” standard required by Apprendi. Apprendi, 530 U.S. at 476, 120 S.Ct. 2348.
Based upon these distinctions, we hold that the principles of Apprendi do not apply to Tennessee’s capital sentencing procedure. Neither the United States Constitution nor the Tennessee Constitution requires that the State charge in the indictment the aggravating factors to be relied upon by the State during sentencing in a first degree murder prosecution.
SEPARATE JURIES
Dellinger and Sutton filed a pretrial motion requesting a severance or, in the alternative, separate juries. At the April 20,1994, hearing on the motion, however, the defendants abandoned their motion for a severance, instead asking that the court grant them separate juries at the same trial. They argued that separate juries at one trial would serve the same purpose as a severance without prolonging the trial process. The trial court overruled the motion, ordering that any evidence that might be inadmissible against one of the defendants would not be allowed into evidence. The court therefore found no reason preventing both defendants from receiving a fair trial before the same jury.
We first note that there is no precedent in Tennessee allowing separate juries. Other jurisdictions have allowed multiple juries in a joint trial to alleviate the duplication of effort required in severed trials. See Adam Hersh, Criminal Law: Joint Criminal Trials with Multiple Juries: Why They Are Used and Suggested Ways to Implement Them, 73 Fla. Bar J. 72, 72 (1999). “The procedure essentially is a grant of severance, but within a framework permitting single presentation of overlapping evidence.” Id. Some jurisdictions allowing multiple jury trials cite as supporting authority the broad discretion allowed a trial court in granting partial or total severance. See, e.g., U.S. v. Rowan, 518 F.2d 685, 690 (6th Cir.1975); People v. Church, 102 Ill.App.3d 155, 57 Ill.Dec. 679, 429 N.E.2d 577, 584 (1981); State v. Corsi, 86 N.J. 172, 430 A.2d 210, 211-13 (1981). Similarly, the decision to grant or deny a severance, governed by Rule 14 of the Tennessee Rules of Criminal Procedure, is *468 within the sound discretion of the trial court. State v. Carruthers, 35 S.W.3d 516, 552-53 (Tenn.2000). There is no prohibition against the use of a multiple jury trial as a form of severance in the Tennessee Rules of Criminal Procedure. Courts have cautioned, however, that the multiple jury procedure is “rife with the potential for error or prejudice.” Hersh, supra, at 73 (quoting Velez v. State, 596 So.2d 1197, 1199-1200 (Fla.Dist.Ct.App.1992)); see also Corsi, 430 A.2d at 213 (expressing concern for the enhanced possibility of error and amount of time required in the complicated procedure required to protect the rights of defendants in a multiple jury trial). Even those courts allowing multiple jury trials admonish that they be used only in relatively uncomplicated cases requiring little movement of the juries in and out of the courtroom and ensuring thorough separation of the juries throughout the proceedings. See, e.g., Corsi, 430 A.2d at 213. We do not condone the practice in Tennessee at this time when no rule has been implemented to specifically address the practical considerations necessary for safeguarding defendants’ rights under the multiple jury procedure. See Hersh, supra, at 73-74 (noting the need for separate voir dire for each defendant, individual opening and closing statements for each defendant, cross-examination of prosecution witnesses out of the presence of the co-defendant’s jury, and separate jury instructions and deliberation rooms for each jury). We therefore find no abuse of discretion in the trial court’s refusal to grant separate juries to the defendants in this case.
Moreover, we find no error in the trial court’s refusal to grant a severance of the defendants in this case. Rule 14(c)(2) requires the severance of defendants when necessary to reach “a fair determination of the guilt or innocence of one or more defendants.” Tenn. R.Crim. P. 14(c)(2)(i), (ii). Severance is not required when the evidence admitted at trial would have been admissible against each defendant at separate trials. State v. Little, 854 S.W.2d 643, 648 (Tenn.Crim.App.1992); State v. Hammonds, 616 S.W.2d 890, 896 (Tenn.Crim.App.1981). Although Sutton claims that the evidence of the .303 rifle and shells discovered at Dellinger’s trailer were improperly admitted against Sutton, we find no support for his contention. See People v. King, 255 Cal.App.2d 551, 63 Cal.Rptr. 345, 348-49 (1967) (in light of the joint commission of the offense, the victim’s hearing aid found on one defendant was admissible as evidence against his co-defendant); People v. Cartalino, 111 Ill.App.3d 578, 67 Ill.Dec. 426, 444 N.E.2d 662, 670 (1982) (bullets found in the possession of the defendant’s accomplice were admissible against the defendant because of proof connecting the defendant and the bullets with the crime). A thorough review of the record reveals no admitted evidence that was improper as to one of the defendants. The trial court’s decision to deny the request for a severance or, alternatively, for separate juries, was therefore within the sound discretion of the court.
JURY SELECTION EXPERT
The trial court initially granted the defendants’ request for a jury selection expert. Margie Fargo thereafter assisted the defendants in selecting a jury that the trial court subsequently declined to empanel, apparently because the jury pool was too small. The trial court sua sponte ruled that it would not authorize funding for a jury selection expert in future proceedings, finding that defense counsel had obtained sufficient knowledge from working with Fargo during the first jury selection. The trial court found that further employment of Fargo was unnecessary to secure a fair trial, particularly in light of *469 defense counsel’s experience. Dellinger and Sutton maintain that, having established a “particularized need” for the jury selection expert, they were not required to meet that threshold level of proof a second time and that the trial court’s revocation of funds for the expert was therefore error.
A defendant must show a “particularized need” for the appointment of an expert. State v. Evans, 838 S.W.2d 185, 192 (Tenn.1992). To prove “particularized need” a defendant must establish that the defendant cannot receive a fair trial without the expert’s assistance and that there exists a reasonable likelihood that the expert will materially assist preparation of the defense. State v. Scott, 33 S.W.3d 746, 753 (Tenn.2000). The decision to award funds for employment of an expert rests in the sound discretion of the trial court. Tenn.Code Ann. § 40-14-207(b); State v. Cazes, 875 S.W.2d 253, 261 (Tenn.1994). Dellinger and Sutton find support for a “particularized need” in their assertion that the death penalty is rarely imposed in cases in which a jury selection expert is used by the defense. They further maintain that withdrawal of expert services once approved is unconstitutional.
We hold that the trial court was not obligated to grant the use of a jury selection expert during the selection of the first jury in this case. The Court of Criminal Appeals held that the defendants’ con-clusory statement that a jury selection expert is necessary for an effective defense in every capital case is insufficient to establish a particularized need. We agree. As we stated in State v. Black, 815 S.W.2d 166, 179-80 (Tenn.1991), the appointment of a jury selection expert is not necessary when the record fails to show that the expert would have materially assisted the defense or that the defendant was deprived of a fair trial.
There having been no entitlement to the jury selection expert in the first jury selection process, we find no error in the trial court’s decision to deny funding for the continued use of the expert in the second jury selection process. We agree with the Court of Criminal Appeals that defense counsel had ample jury trial experience and had the further benefit of information gained from the use of Fargo during the first jury selection process. Dellinger and Sutton cite no authority, and we find none, in support of their position that revoking funds for the jury selection expert violated their constitutional rights. The defendants in this case received a fair trial, and we hold that the trial court did not abuse its discretion in refusing funds for the continued use of a jury selection expert.
VALIDITY OF THE SEARCH WARRANT
On February 28, 1992, Detective Jim Widener of the Blount County Sheriffs Department, accompanied by other officers from the Blount County and Sevier County Sheriffs’ Departments, executed a search of the premises owned by Dellinger. Numerous items were seized as a result of the search, including a .303 rifle and ammunition, a Mossberg shotgun barrel, and multiple shotgun shells. Dellinger filed pretrial motions to suppress as evidence any of the items seized from his property. He alleged that the search warrant used to search his property and seize the items was invalid and that the search and seizure were not lawfully conducted. The trial court overruled Dellinger’s motions.
Dellinger challenges the validity of the search warrant based on several grounds. First, he alleges that the search warrant is invalid on its face for failing to provide supporting facts that create a nexus between the crime and the place to be searched. See State v. Longstreet, 619 *470 S.W.2d 97, 99 (Tenn.1981). The affidavit accompanying the search warrant recited that Dellinger and Sutton were involved in a fight with Griffin on the night of February 21; Griffin’s trailer, which burned later that night, was in close proximity to Dellinger’s residence; Griffin was last seen alive when Dellinger and Sutton bailed him out of jail the same night; Griffin had been shot with a 12-gauge shotgun; and two spent Remington Peters brand 12-gauge buckshot “00” hulls were found near his body. The affidavit further stated that the search would be for a 12-gauge shotgun and Remington Peters brand 12-gauge “00” shells. Based upon these facts, it was reasonable to conclude that Dellinger had been involved in Griffin’s murder and that the murder weapon might be at Dellinger’s residence. The facts set forth in the affidavit create a nexus between the crime and the property to be searched. See State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993) (‘Where the object of the search is a weapon used in the crime ... the inference that the items are at the offender’s residence is especially compelling.”). Del-linger’s claim is therefore without merit.
Dellinger next argues that the search warrant is invalid based upon the statement in the affidavit that Dellinger and Sutton were involved in a fight with Griffin at 7:11 p.m. on February 21, 1992. Dellinger maintains that the statement is false and misleading. An affidavit sufficient on its face may be impeached if it contains “a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause” or “a false statement, essential to the establishment of probable cause, recklessly made.” State v. Little, 560 S.W.2d 403, 407 (Tenn.1978).
Detective Widener admitted that he had not witnessed the fight and that the witnesses who did see the fight were not able to identify Dellinger or Sutton. We agree, however, with the trial court and the Court of Criminal Appeals that the statement was a reasonable conclusion based upon the information Detective Widener obtained during his investigation. Widener knew from the bartenders at Howie’s that Dellinger and Sutton were there with Griffin until approximately 7:00 p.m. on February 21 when they left in a dark-colored Camaro. Witnesses observed three men around 7:11 p.m. fighting in a dark-colored Camaro down the road from Howie’s. When Griffin was arrested later that night, he told the arresting officer that he had just been in a fight with friends. Officer Widener’s statement that Dellinger and Sutton were involved in a fight with Griffin on the night in question was a reasonable conclusion based upon these facts within' the officer’s knowledge at the time the affidavit was sworn. Moreover, the State established during the suppression hearing that the judge issuing the warrant was aware that Officer Widener’s information came from citizen informants. The statement was not a false statement recklessly made or made with intent to deceive the Court.
Dellinger also complains that Detective Widener failed-to comply with Rule 41(c) of the Tennessee Rules of Criminal Procedure, requiring that a copy of the search warrant be left with the person on whom it is served. Rule 41(c) states that failure to leave such a copy “shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.” Tenn. R.Crim. P. 41(c). Dellinger’s wife testified that she was at home when the search warrant was executed and that Detective Widener did not leave a copy of the search warrant with her. Detective Widener testified, however, that he did leave a copy of the search warrant with Delling *471 er’s wife. Dellinger notes that the warrant does not indicate that a copy was left with Dellinger’s wife. However, Rule 41(c) does not require that the warrant include any such notation. By upholding the search warrant’s validity, the trial court impliedly credited Detective Widener’s testimony over that of Dellinger’s wife. This Court will not set aside a trial court’s judgment at the conclusion of an evidentiary hearing unless the evidence in the record preponderates against the trial court’s findings. State v. Killebrew, 760 S.W.2d 228, 233 (Tenn.Crim.App.1988). We hold that the evidence does not preponderate against the trial court’s findings on this issue.
Rule 41(c) also requires the magistrate issuing the warrant to endorse upon the warrant the hour, date, and name of the officer to whom the warrant is issued. Tenn. R.Crim. P. 41(c). Dellinger argues that the warrant in this case is invalid due to improper endorsement. Examination of the search warrant, however, shows that the warrant was issued to Jim Widener on February 28, 1992, at 2:25 p.m. The warrant complies with the endorsement requirement of Rule 41(c).
Section 40-6-104 of the Tennessee Code Annotated requires that the magistrate issuing the warrant first “examine on oath the complainant and any witness the complainant may produce, and take their affidavits in writing, and cause them to be subscribed by the persons making them.” Dellinger argues that the warrant is invalid because the supporting affidavit does not state the time that it was sworn, and it therefore cannot be established that the magistrate issued the warrant after the affidavit was sworn. In its opening lines, the search warrant states in part, “Proof by affidavit having been made before me.... ” (Emphasis added). By its terms, then, the search warrant indicates that there was prior proof by affidavit. The search warrant complies with § 40-6-104.
Dellinger next asserts that officers from Blount County were not authorized to execute a search warrant in Sevier County. Detective Widener, who executed the search warrant on Dellinger’s property in Sevier County, was an officer in the Blount County Sheriffs Department. However, other officers from the Sevier County Sheriffs Department accompanied Detective Widener to Dellinger’s residence. Also, the warrant itself is addressed “to the sheriff, any constable or any peace officer of said [Sevier] county.” Rule 41(c) allows service of a warrant by any peace officer with authority in the county in which the warrant is issued. Tenn. R. Crim P. 41(c). This Court rejected a similar argument in State v. Smith, 868 S.W.2d 561 (Tenn.1993). In Smith, the detective executing the search warrant in Robertson County was with the Metropolitan Nashville Police Department. Id. at 572-73. This Court held, however, that the warrant was not invalidated by the detective’s participation in procuring and executing the warrant. Id. We hold that Officer Widener’s participation in obtaining and executing the search warrant in this case did not invalidate the warrant.
Dellinger finally contends that the officers were not authorized to seize any spent shotgun shells other than the Remington Peters brand 12-gauge “00” shotgun shells specified in the search warrant. “There is no prohibition against the seizure of other property not specifically mentioned in a valid search warrant, if such is relevant to the crimes suggested by the warrant.” State v. Wright, 618 S.W.2d 310, 318 (Tenn.Crim.App.1981). We agree with the Court of Criminal Appeals that any 12-gauge shotgun shells found on Del-linger’s property were relevant to the murder of Griffin based upon the evidence *472 showing that Griffin was shot and killed with a 12-gauge shotgun. The officers’ seizure of non-Remington Peters brand 12-gauge shotgun shells was a reasonable extension of the search and seizure outlined in the warrant in this case. See Jones v. State, 523 S.W.2d 942, 946 (Tenn.Crim.App.1975) (“after a lawful entry on the premises through a search warrant, the question of whether or not an officer can make an added seizure depends upon its reasonableness”). We therefore conclude that the search warrant is valid in this case and hold that no error occurred in its execution. The trial court properly overruled'Dellinger’s motions to suppress evidence seized in the search of his property-
SUFFICIENCY OF EVIDENCE ESTABLISHING THE “PRIOR VIOLENT FELONY” AGGRAVATING CIRCUMSTANCE
Dellinger and Sutton maintain that the State failed to carry its burden of proof in establishing the “prior violent felony” aggravating circumstance. Tenn. Code Ann. § 39 — 13—204(i)(2). Specifically, they assert that the State did not prove that they were the same defendants named in the judgments of conviction for the prior felonies. We disagree. Scott Greene, Assistant District Attorney General for Sevier County, testified that he knew both defendants, that he was present at trial when they were convicted of first degree murder in 1993, and that he prepared the judgment forms signed in the cases. He then identified Dellinger and Sutton as the same defendants convicted in the Sevier County murder.
This case is distinguishable from State v. Williams, No. 03C01-9302-CR-00050, 1996 WL 146696 (Tenn.Crim.App. Apr. 2, 1996), cited by Dellinger and Sutton. In Williams, the only evidence presented to prove the (i)(2) aggravating circumstance were certified copies of the judgments. Id. at *5. The Court of Criminal Appeals held that the evidence was insufficient alone to establish the identity of the defendant as the same Roger Williams convicted of the prior felony. Id. at *5. This Court has similarly held that a certified copy of a judgment merely creates a permissive inference of identification. See Lowe v. State, 805 S.W.2d 368, 371-72 (Tenn.1991). In the current case, however, the testimony of Assistant District Attorney General Greene, in addition to the certified copies of the prior judgments, was sufficient to establish the “prior violent felony” aggravating circumstance.
Dellinger and Sutton also assert that the Branam murder does not constitute a “pri- or violent felony” under the definition of Tenn.Code Ann. § 39 — 13—204(i)(2) because it occurred after Griffin’s murder. We have repeatedly rejected this argument in prior cases and decline to revisit the issue here. See, e.g., State v. Stout, 46 S.W.3d 689, 719 (Tenn.2001); State v. Hodges, 944 S.W.2d 346, 357 (Tenn.1997); State v. Nichols, 877 S.W.2d 722, 736 (Tenn.1994).[4]
INSTRUCTION ON IDENTITY OF THE DEFENDANTS
Dellinger and Sutton argue that they were denied due process because *473 the trial court did not instruct the jury that the identity of the defendants in the prior convictions must be proven beyond a reasonable doubt. Section 39-13-204 of the Tennessee Code Annotated requires proof of any statutory aggravating circumstance beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(0(1), (i). The State must prove beyond a reasonable doubt that the defendant in the conviction used for the (i)(2) aggravating circumstance is the same person as the defendant in the current case. Cf. Lowe v. State, 805 S.W.2d 368 (Tenn.1991) (discussing the improper shifting of the burden of proof to the defendant based upon an incorrect jury instruction). In this case, the trial court properly instructed the jury that the State carried the burden of proving the aggravating circumstance beyond a reasonable doubt. The instruction implicitly required proof beyond a reasonable doubt of the identity of Dellinger and Sutton as those persons previously convicted. The jury is presumed to have followed the trial court’s instructions. Stout, 46 S.W.3d at 715. As the Court of Criminal Appeals noted in its opinion in Williams, the trial court’s instructions in that case specifically addressing the State’s burden of proof for establishing the identity of the defendants under the (i)(2) aggravator were “very adequate.” Williams, 1996 WL 146696 at *5. We do not hold the specific instruction necessary, however, when a general instruction is given on the State’s burden of proving each aggravating factor beyond a reasonable doubt.
INSTRUCTION ON MITIGATING FACTOR THAT THE DEFENDANTS ARE HUMAN BEINGS
Dellinger and Sutton argue that the trial court erred in denying their request to include as one of the mitigating factors in the jury instruction that the defendants are human beings. Section 39-13-204 of the Tennessee Code Annotated requires the trial court to instruct the sentencing jury “to weigh and consider any mitigating circumstances raised by the evidence,” including, but not limited to, the mitigating factors enumerated in subsection (j)- Tenn.Code Ann. § 39-13-204(e)(1). At the time of the commission of the offense, § 39-13-204(e)(l) further required that no distinction be made between the statutorily-defined mitigating circumstances and the non-statutory mitigating circumstances requested by the defendant or the State.[5] Dellinger and Sutton maintain that the requested mitigating factor instruction was raised by the testimony of prison guard Kevin Eisenhower. Eisenhower agreed with defense counsel that, based upon Dellinger’s behavior as an inmate, he is “deserving of respect as a human being.” According to Dellinger and Sutton, the trial court’s failure to instruct on this mitigating factor violated their Eighth and Fourteenth Amendment rights.
“The primary concern in the Eighth Amendment context has been that the sentencing decision be based on the facts and circumstances of the defendant, his background, and his crime.” Clemons v. Mississippi 494 U.S. 738, 748, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the United States Supreme Court held that the Eighth and Fourteenth Amendments require that the sentencer in a capital case be allowed to consider, as a mitigating factor, “any aspect of a defendant’s character or record *474 and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Lockett, 438 U.S. at 604, 98 S.Ct. 2954. The Court noted, however, that courts retain the authority to exclude irrelevant evidence not bearing on the defendant’s character or prior record, or the circumstances of the offense. Id. at 605 n. 12, 98 S.Ct. 2954. “[T]he rule in Lockett is the product of a considerable history reflecting the law’s effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual.” Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Requiring the consideration of relevant mitigating factors recognizes that “a consistency produced by ignoring individual differences is a false consistency.” Id. at 112, 102 S.Ct. 869.
The fact that Dellinger and Sutton are human beings is not relevant mitigating evidence. All criminal defendants are human beings. That fact, therefore, does not relate to the uniqueness of the individual defendant. Moreover, the species of the defendants does not bear on their character or prior record, or the circumstances of the offense. Nor did the prosecutor in any way question the fact that the defendants are human beings. Cf. State v. Bates, 804 S.W.2d 868, 881 (Tenn.1991) (prosecutor’s references to defendant as a “rabid dog” were “patently improper”). The instruction that the defendants are human beings was not relevant to mitigation and therefore was properly refused by the trial court.
JURY QUESTION REGARDING THE MANNER OF SERVING LIFE SENTENCES
During sentencing deliberations, the jury submitted a written question asking the trial court, “If James Dellinger and Gary Sutton were given life in prison from Sevier County and they are given life in prison in Blount County — will the prison terms be consecutive and/or concurrent?” The trial court responded in writing, ‘You should concern yourself with the sentences in these cases only.” Dellinger and Sutton maintain that the sentencing process was prejudiced because the jury would be more likely to impose the death penalty without knowing when the defendants might be released if they were given a life sentence.
The United States Supreme Court has held that the Federal Constitution neither requires nor prohibits instructions to capital sentencing juries on the possibility of commutation, pardon, or parole. California v. Ramos, 463 U.S. 992, 1013-14, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983) (“the wisdom of the decision to permit juror consideration of possible commutation is best left to the States”). “It is true that Ramos stands for the broad proposition that we generally will defer to a State’s determination as to what a jury should and should not be told about sentencing.” Simmons v. South Carolina, 512 U.S. 154, 168, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).
This Court has previously addressed a similar question in State v. Smith, 857 S.W.2d 1 (1993). In Smith, the jury sent a note to the trial judge during sentencing deliberations asking that the court define life sentence, define consecutive and concurrent life terms and explain which would apply if a second life sentence were given, and explain when parole would apply. Id. at 10. The trial court declined to answer the jury’s questions and instructed the jury to resume deliberations. Id. This Court approved the trial court’s response to the jury’s question. We held that instructions on the nature of life sentences, concurrent and consecutive sentencing, and parole eligibility create the possibility *475 of jury speculation on the length of time a defendant would have to serve and could “breed irresponsibility on the part of jurors premised upon the proposition that corrective action can be taken by others at a later date.” Id. at 11. This Court held that instructing the jury on such specific sentencing information could result in sentences of death based on sheer speculation and on factors not enumerated by statute and not sanctioned under the United States Constitution or the Tennessee Constitution. Id. We continue to adhere to this proposition and agree with the trial court’s refusal to answer the jury’s question in this case. See also State v. Burns, 979 S.W.2d 276, 295-96 (Tenn.1998) (approving trial court’s instructions to the jury to refer to the charges and instructions and continue deliberations in response to jury’s specific sentencing questions).
PROPORTIONALITY REVIEW
Although Dellinger and Sutton raise the issue in their appellate brief, we are also bound by statute to review the 'application of the death penalty to determine whether:
(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury’s finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury’s finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.
TenmCode Ann. § 39-13-206(c)(l). As previously discussed, we find the evidence sufficient to support application of the pri- or violent felony aggravator in this case. Having thoroughly reviewed the record, we find that the sentence of death was not imposed in any arbitrary fashion and that the evidence supports the jury’s finding that the aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.
We next are compelled to consider whether the sentence of death in this case is disproportionate to the penalty imposed in similar cases, considering the nature of the crime and the defendant. Tenn.Code Ann. § 39-13-206(e)(l)(D).
In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportional with the crime of first degree murder. A sentence of death may be found disproportionate if the case being reviewed is “plainly lacking in circumstances consistent with those in similar cases in which the death penalty has previously been imposed.” A sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence. Our inquiry, therefore, does not require a finding that a sentence “less than death was never imposed in a case with similar characteristics.” Our duty “is to assure that no aberrant death sentence is affirmed.”
State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998) (citations omitted). We have found the following factors helpful in choosing and comparing cases: 1) the means and manner of death; 2) the motivation for killing; 3) the place of death; 4) the similarity of the victims and treatment of the victims; 5) the absence or presence of premeditation, provocation, and justification; and 6) the injury to and effects on non-decedent victims. Id. In comparing defendants, we consider the following traits: 1) prior criminal history; 2) age, *476 race, and gender; 3) mental, emotional, and physical condition; 4) role in the murder; 5) cooperation with authorities; 6) remorse; 7) knowledge of helplessness of the victim; and 8) capacity for rehabilitation. Id.
In the current case, the victim was shot in the back of the neck, destroying his brain stem, and left dead on a riverbank. The defendants were friends of the victim, and no clear motive was established at trial. The murder was premeditated, and no evidence was presented to show either provocation or justification.
Dellinger, a white male, was forty-one years old at the time of Griffin’s murder. Sutton is also a white male and was twenty-seven years old at the túne of the murder. Dellinger and Sutton were previously convicted of first degree murder for Bra-nam’s death, and Sutton also had a prior conviction for aggravated assault. No evidence was presented to show that Dellinger or Sutton cooperated with the authorities or showed any remorse for the killing. The evidence showed that both men have low- to medium-range IQs. Dellinger dropped out of school at the age of ten, and Sutton dropped out of school in the eighth grade. Dellinger received little nurturing as a child and had developed a distrust of people from a young age. Sutton similarly distrusts people and was mentally and physically abused as a child. Testimony further showed that Dellinger has a borderline personality disorder and Sutton suffers from a depressive disorder and a mixed personality disorder with passive/aggressive and anti-social features. There was testimony presented showing that Dellinger and Sutton were both well-behaved prisoners and held a potential for rehabilitation. Considering the nature of the crime and the defendants, we conclude that this murder places both Dellinger and Sutton into the class of defendants for whom the death penalty is an appropriate punishment.
Dellinger and Sutton argue that the most similar case for purposes of proportionality review is their own prior case in the Branam murder. They urge this Court to find the imposition of the death penalty disproportionate in this case due to the jury’s imposition of life sentences for the Branam murder, in which nearly the same evidence was submitted. See State v. Sutton, No. 03C01-9403-CR-0090, 1995 WL 406953 (Tenn.Crim.App. Jul. 11,1995). The very significant distinguishing factor in this case, however, is the use of the prior conviction for Branam’s murder as an aggravating factor in sentencing for Griffin’s murder.
There have been several previous cases involving shooting deaths of friends or acquaintances in which the death penalty was imposed based upon the prior violent felony aggravating circumstance. In State v. Taylor, 774 S.W.2d 163 (Tenn.1989), the defendant was convicted of first degree murder in the shooting death of a friend. After anotlier friend shot the victim in the head, Taylor shoved the victim out of the car in which they were riding. Id. at 164. Taylor then exited the vehicle, shot the victim as he lay on the street, and helped remove the victim’s shoes and money. Id. The jury sentenced Taylor to death, finding that the murder was committed during the commission of robbery and that Taylor had a prior violent felony conviction. Id. at 164, 166.
In State v. Caldwell, 671 S.W.2d 459 (Tenn.1984), the defendant was convicted of first degree murder after shooting an acquaintance in the back of the head with a shotgun. Testimony indicated that Caldwell believed the victim may have been having an affair with Caldwell’s wife. Id. at 462. Caldwell informed police that he “went crazy” and shot the victim after the *477 victim made sexual advances toward Caldwell and his son and after the victim threw whiskey in Caldwell’s eyes. Id. The jury sentenced Caldwell to death based upon the prior violent felony aggravating circumstance. Id. at 462, 464-65.
In State v. Moore, 614 S.W.2d 348 (Tenn.1981), the defendant was convicted of first degree murder after abducting a former roommate at gunpoint and shooting him twice in the head and once in the chest. Id. at 349. Moore attempted to conceal the body in underbrush and returned two days later to shoot away the victim’s hands, feet, face, and teeth with a shotgun for the purpose of preventing identification of the body. Id. Moore was sentenced to death after the jury found that the murder was committed during the commission of a kidnapping and that Moore was previously convicted of a violent felony. Id. at 349, 350-51.
Based upon an exhaustive review of the record and Rule 12 reports from trial judges in trials for first degree murder in which either life imprisonment or a sentence of death has been imposed, we conclude that the following additional cases in which the death penalty was imposed also bear similarities with the current case. See State v. McKinney, 74 S.W.3d 291 (Tenn.2002) (defendant, who had been drinking, shot nightclub security guard in the back of the head and was sentenced to death based upon the prior violent felony aggravating circumstance); State v. Chalmers, 28 S.W.3d 913 (Tenn.2000) (defendant, who had been drinking and smoking crack, shot victim during a robbery and was sentenced to death based on the sole aggravating factor that defendant had previously been convicted of a violent felony); State v. Smith, 993 S.W.2d 6 (Tenn.1999) (defendant convicted of felony murder for shooting death during robbery of grocery store was sentenced to death based on sole aggravating circumstance that defendant had prior violent felony conviction); State v. Howell, 868 S.W.2d 238 (Tenn.1993) (defendant with brain damage, learning disabilities, and eighth-grade education sentenced to death for shooting convenience store clerk during robbery based upon jury’s finding that murder was committed during robbery and that defendant had prior violent felony conviction). After reviewing these cases, and many others not specifically cited, we are of the opinion that the penalty imposed by the jury against each defendant in this case is not disproportionate to the penalty imposed for similar crimes.
CONCLUSION
In accordance with Tenn. Code Ann. § 39-13-206(c) and the principles adopted in prior decisions, we have considered the entire record and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury’s finding of the statutory aggravating circumstance, that the evidence supports the jury’s finding that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt, and that the sentences are not excessive or disproportionate.
We have reviewed all of the issues raised by the defendants and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm- the decision of the Court of Criminal Appeals. Relevant portions of that opinion are attached as an appendix. The defendants’ sentences of death are affirmed and shall be carried out on the 17th day of September, 2002, unless otherwise ordered by this Court or proper authority. It appearing that the defendants James Henderson Dellinger and Gary Wayne *478 Sutton are indigent, costs of this appeal are taxed to the State.
ADOLPHO A. BIRCH, Jr., J., concurring and dissenting.
APPENDIX
(Excerpts from the Court of Criminal Appeals’ Decision)
IN THE COURT OF CRIMINAL APPEALS OP TENNESSEE
AT KNOXVILLE
February 24, 1998 Session
STATE OF TENNESSEE v. JAMES HENDERSON DELLINGER & GARY WAYNE SUTTON
Appeal as of Right from the Criminal Court for Blount County
No. C-6670 D. Kelly Thomas, Jr.,
No. E1997-00196-CCA-R3-DD
March 7, 2001
Tenn. R.App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.
JERRY SMITH, J., delivered the opinion of the court, in which JAMES CUR-WOOD WITT, Jr., J., concur, PAUL G. SUMMERS, J., not participating.
Eugene B. Dixon; Charles Deas, Mary-ville, Tennessee, for appellant, James Henderson Dellinger, and F.D. Gibson,
Maryville, Tennessee and John Goergen, Knoxville, Tennessee, for the appellant, Gary Wayne Sutton.
John Knox Walkup, Attorney General <& Reporter; Michael E. Moore, Solicitor General; Kenneth W. Rucker, Assistant Attorney General; and Mike Flynn, District Attorney General, for the appellee, State of Tennessee.
OPINION
(Deleted Summary of Testimony)
(Deleted Discussion of Separate Juries for Each Appellant)
SEPARATE JURIES DURING THE GUILT AND SENTENCING PHASES
Appellants contend that the trial court erred when it denied their motion for separate juries during the guilt and sentencing phases of trial. We disagree.[1]
First, Appellants contend that having the same jury during the guilt and sentencing phases is unconstitutional because it deprived them of their right to a fair trial. Specifically, Appellants contend that the current system is unfair because the State’s ability to challenge jurors that have personal views against the death penalty[2] leads to a system where the jury is more likely to convict. However, the Tennessee Supreme Court has previously considered and rejected this argument. See State v. Harbison, 704 S.W.2d 314, 318-319 (Tenn. *479 1986) (rejecting the argument that a defendant is entitled to separate juries during the guilt and sentencing phases of a capital trial in order to guarantee a fair trial by a jury that represented a cross section of the community); State v. Zagorski, 701 S.W.2d 808, 814-15 (Tenn.1985) (rejecting the argument that a defendant is entitled to separate juries during the guilt and sentencing phases of a capital trial on the theory that a “death qualified” jury is skewed toward a finding of guilt in contravention of the right to a fair and impartial jury composed of a cross-section of the community); see also State v. Hall, 958 S.W.2d 679, 717 (Tenn.1997) (rejecting the argument that the manner of selecting “death qualified” jurors results in juries that are prone to conviction); State v. Teel, 793 S.W.2d 236, 246 (Tenn.1990) (rejecting the argument that the process of “death qualifying” prospective jurors produces a jury that is biased in favor of the State on the issue of guilt or innocence and is not fairly representative of the community).
Second, Appellants contend that having the same jury during the guilt and sentencing phases is unconstitutional because it violates the constitutional right to be tried by an impartial jury. Essentially, Appellants contend that it is impossible for a jury that has convicted a defendant of first-degree murder to be impartial when it decides whether to impose a death sentence on that defendant. However, Appellants have failed to cite any authority or anything in the record in support of this proposition. We cannot agree that the mere fact that a jury has convicted a defendant of first degree murder automatically renders that jury incapable of impartially deciding whether to impose a death sentence. This issue has no merit.
CONSTITUTIONALITY OF THE DEATH PENALTY
Appellants contend that the trial court erred when it failed to declare that Tennessee’s death penalty statutes and procedures are unconstitutional. We disagree.
First, Appellants contend that Tennessee’s death penalty statutes and procedures are unconstitutional because the jury is required to impose a death sentence if it finds that the aggravating circumstances outweigh the mitigating circumstances and thus, the jury has no discretion when it decides whether to impose a death sentence.[3] This argument has previously been considered and specifically rejected by the Tennessee Supreme Court. See State v. Smith, 857 S.W.2d 1, 22 (Tenn.1993) (holding that Tennessee’s death penalty statutes “do[] not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution”).
Second, Appellants contend that Tennessee’s death penalty statutes and procedures are unconstitutional because imposition of the death penalty is cruel and unusual punishment. This argument has also been considered and specifically rejected by the Tennessee Supreme Court. See State v. Black, 815 S.W.2d 166, 187-91 (Tenn. 1991) (holding that the death penalty is not unconstitutional per se as cruel and unusual punishment).
Third, Appellants contend that Tennessee’s death penalty statutes and procedures are unconstitutional because the Tennessee legislature has concluded that *480 juries are incapable of rendering fair and just verdicts. In addition to the fact that this argument makes no mention of either the federal or the state constitutions, this argument is also inaccurate. Appellants’ argument ignores the fact that the Tennessee Legislature has expressly and specifically required that the jury impose the sentence in capital cases. See Tenn. Code Ann. § 39-13-204(a) (1991). Contrary to Appellants’ assertions, it is clear that in enacting this statutory scheme, the legislature has manifested a belief that juries are capable of rendering fair and just verdicts in capital cases.
Fourth, Appellants contend that Tennessee’s death penalty statutes and procedures are unconstitutional because the immediate sentencing of a capital defendant after pronouncement of the verdict does not afford the capital defendant the same rights as other defendants who are sentenced by the trial court during a separate sentencing hearing. Specifically, Appellants contend that this sentencing procedure violates the constitutional right of capital defendants to equal protection. Appellants have cited no authority in support of this proposition and we reject it. Equal protection requires that all persons who are similarly situated must be treated alike. See State ex rel. Stewart v. McWherter, 857 S.W.2d 875, 876 (Tenn.Crim.App.1992). It is obvious that capital defendants and defendants in all other cases are not similarly situated and thus, principles of equal protection are simply not implicated here.[4]
Fifth, Appellants contend that Tennessee’s death penalty statutes and procedures are unconstitutional because the statutes do not narrow the class of death eligible defendants. As support for this proposition, Appellants cite State v. Middlebrooks, in which the Tennessee Supreme Court held that when a defendant is convicted of first-degree murder solely on the basis of felony-murder, the felony-murder aggravating circumstance does not narrow the class of death eligible murderers sufficiently to satisfy the federal and state constitutions. 840 S.W.2d 317, 346 (Tenn.1992). However, in this case, Appellants were charged and convicted of deliberate and premeditated first degree murder, not felony murder. Further, the State sought imposition of the death penalty based on Appellants’ prior convictions for felonies involving violence to the person and not on the felony murder aggravating circumstance. Thus, Middlebrooks is inapplicable to this case.
Finally, Appellants contend that Tennessee’s death penalty statutes and procedures provide for constitutionally inadequate appellate review because the statutes do not require the jury to issue a finding as to what mitigating circumstances were found and why the aggravating circumstances outweighed the mitigating circumstances. This argument has previously been considered and specifically rejected by the Tennes *481 see Supreme Court. See State v. Brimmer, 876 S.W.2d 75, 87 (Tenn.1994) (rejecting the argument that there is no meaningful appellate review of death sentences because there is no requirement for written findings concerning mitigating circumstances). This issue has no merit.
VENUE
Appellants contend that the trial court erred when it denied their request for a change of venue. We disagree.
“In all criminal prosecutions the venue may be changed upon motion of the defendant ... if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had.” Tenn. R.Crim. P. 21(a). However, “[t]he mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue.” State v. Mann, 959 S.W.2d 503, 532 (Tenn.1997). “The matter of change of venue addresses itself to the sound discretion of the trial court, and a denial of a change of venue will only be reversed on appeal for an affirmative and clear abuse of discretion.” State v. Vann, 976 S.W.2d 93, 114 (Tenn.1998). In addition, “[bjefore an accused is entitled to a reversal of his conviction on the ground that the trial judge erroneously denied his motion for a change of venue, he must demonstrate ... that the jurors who actually sat were biased and/or prejudiced.” Mann, 959 S.W.2d at 532 (citation and internal quotations omitted).
On January 6, 1996, Appellants filed a motion for change of venue in which they referred to an article in that day’s edition of the Daily Times.[5] Although the trial court’s order of January 31, 1996, which denied the motion states that the court heard testimony from -witnesses and argument from counsel, the record does not contain a transcript of this hearing. However, the record does contain two volumes of excerpts from the voir dire that was conducted in this case. A review of these excerpts indicates that the trial court carefully and meticulously orchestrated the jury selection process to ensure the selection of an impartial jury. The trial court conducted individual voir dire of the potential jurors in order to determine whether they had heard anything about the facts of this case and the Connie Branam case that would interfere with their impartiality. The trial court then gave counsel for the State and the defense the opportunity to ask further questions. The trial court then excused any potential jurors who indicated that they would have difficulty being impartial.
In this case, Appellants have failed to specifically identify any pretrial publicity that would suggest that there was any “undue excitement against [them]” in Blount County or any other reason why a fair trial could not be had in Blount County. Moreover, Appellants have failed to identify a single juror who was allegedly biased. Quite simply, Appellants have failed to meet them burden of showing that any of the jurors who sat during trial were actually biased or prejudiced against them. This issue has no merit.
VOIR DIRE
Appellants contend that the trial court erred when it limited the amount of questions that could be asked during voir dire. We disagree.[6]
*482 “The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court.” State v. Stephenson, 878 S.W.2d 530, 540 (Tenn.1994).
The record indicates that after five and one half days of voir dire, the trial court decided that the process was taking too long. The trial court therefore decided that it would conduct the individual voir dire of the potential jurors and it would then give counsel for the State and the defense the opportunity to question the potential jurors about any ambiguous answers. The trial court then conducted individual voir dire and defense counsel was allowed to question the potential jurors about pretrial publicity and about their views on the death penalty.
Appellants’ only allegation as to how they were prejudiced by the trial court’s method of conducting voir dire is the vague statement that “they could not get a feel of the true feeling of the jurors concerning the death penalty.” Indeed, Appellants have failed to indicate anything they could or would have done differently if the trial court had conducted voir dire differently. In addition, Appellants have failed to identify a single instance in which they were prevented from asking questions of a potential juror. Further, Appellants have not even argued that any of the jurors who were actually selected through this method of voir dire were biased or prejudiced. Indeed, the partial excerpts that are contained in the record indicate that the trial court excused jurors who indicated that they would be unable to be impartial. Under these circumstances, we conclude that the trial court did not abuse its discretion when it conducted voir dire in the manner that it did. This issue has no merit.
(Deleted Discussion of Jury Selection Expert)
INTELLIGENCE QUOTIENT TESTING
Appellants contend that the trial court erred when it failed to order that an intelligence quotient (“IQ”) test be administered to Appellants while they were under the influence of alcohol. We disagree.
On July 27, 1995, Appellants filed a motion asking the court to order that they be tested for IQ while they were under the influence of alcohol. At the hearing on the motion on January 30, 1996, Appellants argued that their consumption of alcohol shortly before the time that Griffin was killed may have lowered their IQ level below 70, which would have rendered them statutorily ineligible for the death penalty.[7] However, Appellants argue on appeal that their IQ level while they were intoxicated was relevant to the elements of intent and premeditation.
Dr. Peter Young testified for the defense that according to the results of IQ testing, Dellinger had an IQ level of 72 in March of 1995 and Sutton had an IQ level of 76 in November of 1993. Dr. Young then opined that Appellants’ use of alcohol could have reduced their IQ level to below 70 at the time that Griffin was killed. On cross-examination, Dr. Young admitted that the authorities upon which he based his opinion actually contradicted his opinion. Dr. Young also admitted that there was no recognized statistical data that *483 could be used to adjust Appellants’ IQ levels while they were functioning in an intoxicated state.
Dr. Eugene Cord testified for the State that the results of an IQ test would be invalid if the test had been given to an intoxicated person. Dr. Cord also testified that while intoxication would impair performance, it would not affect IQ level. Dr. Cord testified that he was unaware of any statistical data that could be used to adjust an individual’s IQ level while in an intoxicated state.
At the conclusion of the hearing, the trial court found that there was no proof that alcohol use had any effect on IQ level. The trial court also found that it would be useless to test Appellants for IQ level while they were intoxicated because there was no recognized test for doing so. Moreover, the trial court found that Appellants had also failed to prove that they had deficits in adaptive behavior or that they had mental retardation that was manifested during the developmental period or by age eighteen.
We conclude that the evidence in the record does not preponderate against the trial court’s findings that alcohol use does not effect IQ level and that there is no recognized test for determining the IQ level of an intoxicated person. Thus, testing Appellants for IQ level while they were intoxicated would have been an exercise in futility. In addition, the trial court’s refusal to order the IQ tests did not prevent Appellants from showing that they did not have the required mental state for first degree murder because they were intoxicated at the time of the offense. Indeed, there was a great deal of evidence that Appellants had been drinking shortly before Griffin was killed and the trial court instructed the jury that “[i]f you find that [Appellants] were intoxicated to the extent that they could not have possessed the required culpable mental state, then they cannot be guilty of the offense charged.” In short, the trial court did not err when it refused to order that Appellants be tested for IQ levels while they were intoxicated. This issue has no merit.
(Deleted Discussion of Admission of Evidence Seized Pursuant to a Search Warrant)
EVIDENCE OF OTHER CRIMES
Appellants contend that the trial court erred when it admitted evidence about the altercation that occurred on the Alcoa Highway, the burning of Griffin’s trailer, and the murder of Branam. Specifically, Appellants contend that this evidence was inadmissible because its only purpose was to show that they had violent character traits and even if it had been relevant to some other purpose, its probative value was outweighed by its prejudicial effect. We disagree.
Under Rule 404(b) of the Tennessee Rules of Evidence:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
(1) The court upon request must hold a hearing outside the jury’s presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3) The court must exclude the evidence if its probative value is out *484 weighed by the danger of unfair prejudice.
Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime. Tenn. R. Evid. 404 (Advisory Commission Comments); State v. DuBose, 953 S.W.2d 649, 654 (Tenn.1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn.1985). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. DuBose, 953 S.W.2d at 652. Where a court fails to substantially comply with these requirements, the court’s decision is afforded no deference. Id.[8]
A. The Altercation on the Alcoa Highway and the Burning of Griffin’s Trailer
The trial court ruled that evidence about the altercation on the Alcoa Highway and the burning of Griffin’s trailer was relevant to establishing the sequence of events on the night of Griffin’s murder. In addition, the trial court also found that the probative value of this evidence was not outweighed by danger of unfair prejudice.
We conclude that the trial court did not abuse its discretion when it ruled that this evidence was admissible. The evidence that showed that Appellants were involved in an altercation with Griffin and that they set fire to Griffin’s trailer on the night that he was killed was relevant to establishing Appellants’ intent and motive for killing Griffin. Indeed, the Tennessee Supreme Court has previously recognized that evidence of prior acts of violence against the victim are admissible under Rule 404(b) because the evidence is relevant to show the defendant’s hostility toward the victim, malice, intent, and a settled purpose to harm the victim. State v. Smith, 868 S.W.2d 561, 574 (Tenn.1993). Moreover, the evidence that tied Appellants to the other crimes against Griffin that were committed just hours before Griffin was killed was also relevant to establishing the identity of Griffin’s killers. Indeed, Rule 404(b) provides for the admissibility of evidence about other crimes when relevant to issues of identity, intent, and motive. See Tenn. R. Evid. 404(b) (Sentencing Commission Comments). We also conclude that the probative value of this evidence was not outweighed by danger of unfair prejudice. This issue has no merit.
B. The Connie Branam Murder
The trial court ruled that the State could introduce evidence about the murder of *485 Branam, but the State could not introduce the fact that Appellants had been convicted of the Branam murder. The trial court found that the evidence about the Branam murder was admissible because it was relevant to establishing the identity of Griffin’s killers.
We conclude that the trial court did not abuse its discretion when it ruled that this evidence was admissible. The evidence regarding the Branam murder showed that when Appellants went to Howie’s Hideaway with Branam the day after Griffin was killed, they acted suspiciously by repeatedly questioning the barmaids about whether they remembered seeing them with Griffin on the previous day and by attempting to fabricate a story about drinking at the bar with Griffin after he had been released from jail. In addition, the evidence showed that when Newman told Appellants that she remembered them from the day before, Sutton attempted to convince Newman to come with them. When Newman refused, Sutton threatened her. This evidence suggests that Appellants had the intent to silence any -witness who could connect them with Griffin’s murder. Thus, the evidence of Branam’s murder was highly relevant to establishing the identity of Griffin’s killers because it tended to show that Appellants had killed Bra-nam in order to conceal the fact that they had murdered Griffin. In addition, we conclude that the highly probative value of this evidence was not outweighed by the danger of unfair prejudice. Under these circumstances, we cannot say that the trial court abused its discretion when it admitted this evidence. This issue has no merit.[9]
ADMISSION OF A RIFLE AND SHELLS INTO EVIDENCE
Appellant Sutton contends that the trial court erred when it admitted the .303 rifle and the .303 shells that -were found at Dellinger’s residence into evidence. Specifically, Sutton contends that this evidence was inadmissible because it was not relevant to any issue in the case. We disagree.
As this Court has previously stated, the determination of whether evidence is relevant is within the sound discretion of the trial court. State v. Griffis, 964 S.W.2d 577, 594 (Tenn.Crim.App.1997). In this case, investigators testified that a .303 rifle shell had been found in the burned car that contained Branam’s body. In addition, Carmen testified that he had determined that this rifle shell was fired from the .303 rifle that was found in Dellinger’s residence. This evidence helped connect Appellants to the Branam murder and as we have previously stated, evidence regarding the Branam murder was very relevant to establishing the identity of Griffin’s killers. Thus, we conclude that the trial court did not abuse its discretion when it admitted this evidence. This issue has no merit.
*486 ADMISSION OF GRIFFIN’S STATEMENTS INTO EVIDENCE
Appellants contend that the trial court erred when it allowed the State to introduce the statements that Griffin made to Officer Roberts concerning the incidents on the Alcoa Highway. Specifically, Appellants contend that Griffin’s statements were inadmissible hearsay. We disagree.
Rule 803 of the Tennessee Rules of Evidence provides, in relevant part,
The following are not excluded by the hearsay rule:
(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.
Tenn. R. Evid. 803(2). The Tennessee Supreme Court has stated that in order for a statement to be admissible under this rule, (1) there must be a startling event or condition, (2) the statement must relate to the startling event or condition, and (3) the statement must be made while the declar-ant is under the stress or excitement from the event or condition. State v. Gordon, 952 S.W.2d 817, 820 (Tenn.1997). In addition, “[i]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and then-rulings will not be reversed absent an abuse of that discretion.” State v. McLeod, 937 S.W.2d 867, 871 (Tenn.1996).
During the hearing on this issue, Officer Roberts testified that on the night of February 21, 1992, he received a report of a possible fight involving individuals in a black Camaro with one headlight. When Roberts arrived at the scene approximately two minutes later, he found Griffin sitting in the bed of a pickup truck. Upon viewing Griffin, Roberts concluded that Griffin had been in a fight because he was not wearing a shirt, he had scratches on his upper body, and he had a cut behind his left ear. Roberts testified that when he asked Griffin what had happened, Griffin stated that he had been in an argument with some friends and they had put him out of a car. Roberts testified that at this time, Griffin’s voice was shaky, his lip was quivering, and he appeared to be scared. When Roberts asked for further information, Griffin said, “I just can’t tell you man,” and he looked like he was going to cry. Griffin also looked around as if he was looking for someone.
We conclude that the trial court did not abuse its discretion when it admitted Griffin’s statements under Rule 803(2). First, it is clear that the altercation during which Griffin sustained scratches and a cut qualifies as a startling event under the rule. As noted by the supreme court, “the possibilities are endless because any event deemed startling is sufficient.” Gordon, 952 S.W.2d at 820 (citation and internal quotations omitted). Second, Griffin’s statements all related to the altercation. As noted by the supreme court, “considerable leeway is available, because the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition.” Id. (citation and internal quotations omitted). Third, Griffin made his statements while he was still under the stress or excitement of the altercation. For this third requirement, “[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.” Id. (citation omitted). In this case, Roberts testified that he responded to the scene within two minutes of *487 receiving the call and that when he talked to Griffin, Griffin’s voice was shaky, his lip was quivering, and he appeared to be scared and ready to cry. Thus, the evidence shows that Griffin was still under the stress or excitement of the altercation when he made his statements.[10] This issue has no merit.
ADMISSION OF THE TRANSCRIPT OF SUTTON’S PRETRIAL STATEMENT INTO EVIDENCE
Appellant Sutton contends that the trial court erred when it allowed the State to introduce a transcript of his pretrial statement into evidence. We disagree.
Initially, we note once again that “[i]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion.” McLeod, 937 S.W.2d at 871.
Detective Widener testified that he had interviewed Sutton at the Sevier County Sheriffs Department on February 25, 1992. Widener also testified that this interview had been electronically recorded. The State then introduced the audiotape of the interview and began playing the tape for the jury. After a few minutes, the trial court stopped the tape and asked the jurors whether they could understand the tape. The jurors indicated that they could not.
During a subsequent jury out hearing, Widener testified that he was present when Sutton gave his statement, that he had heard Sutton’s words, that he had previously listened to the tape and verified that the transcript of the tape was aceu-rate. Widener testified that he had listened to the tape when it was in “better shape” than it was at trial and he had compared it to the transcript several times. Widener acknowledged that there were many instances in which the transcript indicated that a part of the tape was “unintelligible.” The trial court subsequently allowed the State to introduce the transcript into evidence.
Sutton essentially argues that the transcript should not have been admitted because it was not accurate. This argument ignores the testimony of Widener that he heard Sutton give the statement, that he had reviewed the tape, that he had reviewed the transcript, and that he had determined that the transcript was accurate. The fact that the transcript contains numerous indications that a part of the tape was “unintelligible” does not mean that the transcript was inaccurate. Thus, we conclude that the trial court did not abuse its discretion when it admitted this evidence. This issue has no merit.
ADMISSION OF MISSING PERSON REPORTS INTO EVIDENCE
Appellants contend that the trial court erred when it allowed the State to introduce the two missing persons reports filed by Viola Griffin in which she stated that she had not seen or heard from Griffin since February 21, 1992, at 11:45 p.m. and she had not seen or heard from Branam since February 22, 1992, at 1:00 p.m. We conclude that Appellants have waived this issue.
The record indicates that when the State sought to introduce the reports during rebuttal, Appellant Sutton objected on the *488 ground that the reports were not proper rebuttal evidence. After a bench conference, Sutton objected again on the ground that the reports were irrelevant and immaterial. The trial court overruled the objection.
On appeal, Appellants have abandoned the argument that the reports were improper rebuttal evidence. Thus, we do not address it. Instead, Appellants argue for the first time on appeal that the reports were inadmissible hearsay evidence.[11] “It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a different ground or reason in this Court.” State v. Dobbins, 754 S.W.2d 637, 641 (Tenn.Crim.App.1988). Thus, this issue is waived.
EXPERT TESTIMONY IN REBUTTAL
Appellants contend that the trial court erred when it allowed Dr. Harlan to testify for the State in rebuttal. We disagree.
The determination of the admissibility of rebuttal evidence lies in the discretion of the trial court and this Court will not interfere with the exercise of this discretion unless there has been clear abuse of discretion appearing on the face of the record. State v. Kendricks, 947 S.W.2d 875, 884 (Tenn.Crim.App.1996).
The record indicates that when the State attempted to call Dr. Cleland Blake, Appellants objected and the trial court conducted a jury out hearing. Although the record indicates that the trial court subsequently ruled that Dr. Blake would not be allowed to testify, the transcript of the hearing was not included in the record pursuant to instructions from defense counsel. The State therefore relied on the testimony of Dr. Ellington and Jason McDonald to establish the time of Griffin’s death.
As part of the defense proof, Dr. Wolfe opined that Griffin had died between twenty-four and thirty-six hours before his body was discovered on February 24,1992. Thereafter, the State called Dr. Harlan in rebuttal and Appellants objected. The trial court overruled the objection, and Dr. Harlan testified that it was his opinion that Griffin died between 6:00 p.m. on February 21,1992, and 8:00 a.m. on February 22, 1992. Dr. Harlan also testified that he had reviewed the testimony of Dr. Wolfe and he disagreed with many of the conclusions that Dr. Wolfe had made from viewing the evidence in the case. The trial court then asked whether Appellants had anything in surrebuttal, and Appellants stated that they did not.
Appellants essentially argue that because Dr. Harlan could have testified during the State’s case in chief, he should not have been allowed to testify during rebuttal. However, this Court has previously stated that “we have observed that it is within the discretion of the trial court to permit the state, in a criminal case, to introduce in rebuttal even testimony which should have been introduced in chief.” Kendricks, 947 S.W.2d at 884 (citation omitted). It is clear that the State could have called Dr. Harlan during its case in chief. However, although the record is not entirely clear because defense counsel prevented the relevant hearing from being transcribed into the record, a reading of the record indicates that the State’s purpose in calling Dr. Blake was to elicit expert testimony about the time of Grif *489 fin’s death. When the trial court ruled that Dr. Blake could not testify, the State decided to rely on what was essentially lay testimony from Ellington and McDonald about the time of death. Once Appellants proffered the testimony of Dr. Wolfe, it was within the trial court’s discretion to allow the State to call its own expert to rebut Wolfe’s opinion.[12]
Appellants also contend that it was improper for Dr. Harlan to testify in rebuttal because the State did not disclose Dr. Harlan’s identity to Appellants before trial. However, it is clear that the State did not disclose Dr. Harlan’s identity before trial because it intended to call Dr. Blake as its expert. In addition, it is well-established that the State’s duty to disclose the names of its witnesses is merely directory, not mandatory. State v. Harris, 839 S.W.2d 54, 69 (Tenn.1992). In addition, a defendant will be entitled to relief for nondisclosure only if he or she can demonstrate prejudice, bad faith, or undue advantage. Id. In this case, Appellants claim that they were prejudiced because the fact that Dr. Harlan testified without prior notice prevented them from offering anything in sur-rebuttal. However, the record indicates that when the trial court asked Appellants whether they had anything in surrebuttal, Appellants neither expressed an intention to offer surrebuttal nor asked for a continuance in order to call other witnesses. Thus, Appellants have waived any claim that they were prevented from calling further witnesses to offer surrebuttal. See Tenn. R.App. P. 36(a). This issue has no merit.
SUFFICIENCY OF THE EVIDENCE
Both Appellants contend that the evidence was insufficient to support their convictions for first degree murder because the State failed to establish all of the elements of the offense beyond a reasonable doubt. In addition, Appellant Sutton contends that the evidence was insufficient to support his conviction under the theory that he was criminally responsible for the conduct of Appellant Dellinger.
When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State’s witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn.1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, “the [Sjtate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom.” Id. Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, *490 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn.Crim.App.1996). Moreover, this Court may not substitute its own inferences “for those drawn by the trier of fact from circumstantial evidence.” Matthews, 805 S.W.2d at 779. Finally, Rule 13(e) of the Tennessee Rules of Appellate Procedure provides, “findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt.”
A. The Elements of First Degree Murder
Appellants contend that the State failed to establish all of the elements of first degree murder beyond a reasonable doubt. We disagree.
When Griffin was killed in 1992, Tennessee’s first-degree murder statute provided that “[flirst degree murder is: [a]n intentional, premeditated and deliberate killing of another.” Tenn.Code Ann. § 39-13-202 (1991).[13]
First, Appellants contend that the evidence was insufficient to support their convictions because the State failed to prove that Appellants were the individuals who killed Griffin. However, we conclude that when the evidence is viewed in the light most favorable to the State, as it must be, the evidence was clearly sufficient for a rational jury to find beyond a reasonable doubt that Appellants killed Griffin.
Carr saw Appellants and Griffin come to Howie’s Hideaway on February 21, 1992, in a dark blue Camaro or Trans Am. Newman observed Appellants and Griffin when they left Howie’s Hideaway at approximately 7:00 p.m. Approximately ten minutes later, Mr. and Mrs. Walker observed an altercation on the Alcoa Highway in which a person standing outside of a dark-colored Camaro with one headlight appeared to be fighting with a person inside the Camaro. That same night, Davis saw a shirtless man stumbling around by the Alcoa Highway and she subsequently saw two men standing by a dark-colored Cama-ro in the same area who appeared to be looking for something.
When Officer Roberts responded to the call about the altercation on the Alcoa Highway, he found a shirtless Griffin sitting on the bed of a pickup truck. Griffin initially stated that an argument had taken place and that some friends put him out of a car, but when questioned further, he stated that the men were not really his friends. Griffin refused to give any other information and Roberts subsequently arrested Griffin for public intoxication and took him to the Blount County Jail. Sergeant Herron participated in the booking of Griffin into the jail at 7:40 p.m. Approximately forty-five minutes later, Dellinger approached Herron and asked when Griffin could be released. Herron told Del-linger that the victim would be kept a minimum of four hours.
At approximately 9:00 p.m., Henry saw Dellinger’s white pickup truck drive up the road from the direction of Griffin’s trailer and pull into Dellinger’s driveway. A few seconds later, Henry saw flames shooting out of Griffin’s trailer. Clabo subsequently investigated the fire and concluded that the fire had been set by human hands using a liquid accelerant.
*491 When Jennifer Branam learned that Griffin’s trailer was on fire, she went to Dellinger’s trailer and asked Appellants to accompany her to Griffin’s trailer. Del-linger then stated that he could not go because he was in enough trouble already. Later that night, Jennifer Branam saw Appellants move an object that looked like a shotgun from Dellinger’s truck to Linda Dellinger’s car.
Griffin was subsequently released from jail at 11:25 p.m. when Dellinger returned to the jail and posted a cash bond. Shortly thereafter, Lieutenant Defoe saw Appellants leave the jail with an individual who had just been released.
At 11:55 p.m., McDonald heard two or three gunshots coming from the Blue Springs/Blue Hole area near his home. On February 24, 1992, Carter found the body of a man in the Blue Hole area. Hamilton stated that he subsequently located the body and he also found two spent twelve-gauge shotgun shells and two empty beer cans by the body. Agent Car-man subsequently determined that shotgun shells found in Dellinger’s yard and the surrounding area and the shells found near Griffin’s body had been fired from the same shotgun. Dr. Harlan opined that Griffin died between 6:00 p.m. on February 21,1992, and 8:00 a.m. on February 22, 1992.
The next day, Appellants went to How-ie’s Hideaway with Branam. While they were there, Dellinger repeatedly asked Carr and Newman whether they remembered Appellants from the previous day. Sutton subsequently attempted to get Newman to leave with Appellants and when she refused, Sutton threatened her. Appellants and Branam left at 6:30 p.m., and the flames from the vehicle that contained Branam’s body were seen at 8:00 p.m. Clabo subsequently concluded that the fire had been set by human hands with the use of an outside ignition source. Car-man subsequently determined that the .303 rifle shell recovered from the scene of the burned vehicle was fired from the rifle that was found in Dellinger’s home.
It is clear that the above evidence, when viewed in the light most favorable to the State, is sufficient for a rational jury to find beyond a reasonable doubt that Appellants were the individuals who killed Griffin. A rational jury could conclude from this evidence that Appellants fought with Griffin at approximately 7:10 p.m., set fire to Griffin’s trailer at approximately 9:00 p.m., and then retrieved a shotgun. A rational jury could also conclude that Griffin was killed at 11:55 p.m., only thirty minutes after he was last seen alive in the presence of Appellants. A rational jury could also conclude that Appellants had murdered Branam in order to cover-up the murder of Griffin. Thus, a rational jury could certainly conclude that because Appellants fought with Griffin five hours before he was killed, that Appellants set fire to Griffin’s trailer three hours before he was killed, that Appellants bailed Griffin out of jail and took him with them thirty minutes before he was killed, that the shotgun hulls found near Griffin’s body had been fired from the same gun as the hulls found in Dellinger’s yard, and that Appellants killed Branam in order to conceal the murder of Griffin, that Appellants were the individuals who killed Griffin.[14]
Appellants also claim that the evidence was insufficient to support their conviction *492 because the State failed to prove that the murder was committed with premeditation and deliberation. Premeditation requires a showing of a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn.1992). Deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. Id. Although premeditation “may be formed in an instant, deliberation requires some period of reflection, during which the mind is ‘free from the influence of excitement, or passion.’ ” State v. Brown, 836 S.W.2d 530, 538 (Tenn.1992) (citation omitted). While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, more than a “split-second” of reflection is required in order to satisfy the elements of premeditation and deliberation. Id. at 543.
The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn.Crim.App.1995). Tennessee courts have delineated several circumstances that may be indicative of premeditation and deliberation, including planning activity prior to the actual killing, State v. Schafer, 973 S.W.2d 269, 273 (Tenn.Crim.App.1997); facts from which motive may be inferred, Bordis, 905 S.W.2d at 222; the use of a deadly weapon upon an unarmed victim, Brown, 836 S.W.2d at 841[541]; and facts about the nature of the killing. Bordis, 905 S.W.2d at 222.
We conclude that the above evidence, when viewed in the light most favorable to the State, was sufficient for a rational jury to conclude beyond a reasonable doubt that Appellants killed Griffin with both premeditation and deliberation. First, there was evidence that Appellants planned the murder of Griffin before they killed him. Indeed, the evidence shows that after fighting with Griffin, Appellants attempted to bail him out of jail. When this attempt failed, Appellants burned down Griffin’s trailer and then retrieved a shotgun. Appellants then returned to the jail, successfully obtained Griffin’s release, and then killed him thirty minutes later. Second, there was evidence that Appellants had a motive to kill Griffin. For whatever reason, Appellants were angry enough with Griffin to fight with him and then set fire to his residence. Third, there is absolutely no indication that Griffin was armed when he was shot with the shotgun. Fourth, the fact that Griffin was taken to a remote area and was then shot in the back of the head indicates that the killing was done as part of a preconceived design. In short, a rational jury could conclude from these circumstances that Appellants decided to kill Griffin and then reflected on that decision with cool purpose for some period that was at least more than a “split-second” before they shot and killed him. This issue has no merit.
B. Criminal Responsibility
Sutton contends that the evidence was insufficient to support his conviction because there was no proof that he fired the shot that killed Griffin or that he did anything to assist Dellinger. We disagree.
Tennessee Code Annotated section 39-11-402 states in relevant part that
“A person is criminally responsible for an offense committed by the conduct of another if ... [ajcting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.”
*493 Tenn.Code Ann. § 39-11-402(2) (1991). In order to establish that the defendant had the intent required by this subsection, it must be shown “that the defendant in some way associate^] himself with the venture, act[ed] with knowledge that an offense [wa]s to be committed, and share[d] in the criminal intent of the principal in the first degree.” State v. Maxey, 898 S.W.2d 756, 757 (Tenn.Crim.App.1994) (citation and internal quotations omitted). “The defendant must knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime.” Id. (citation and internal quotations omitted).
The evidence in this case showed that both Appellants were drinking with Griffin in Howie’s Hideaway on February 21, 1992. Both Appellants and Griffin subsequently left the establishment in Sutton’s Camaro. Ten minutes later, the Walkers observed the altercation on the Alcoa Highway. Two hours later, Henry saw Dellinger’s truck driving away from Griffin’s burning trailer. When Jennifer Bra-nam then went to Dellinger’s trailer to obtain help, Sutton lied to her and stated that Griffin was in Blount County with a woman. Later that night, Jennifer Bra-nam saw both Appellants take an object that looked like a shotgun out of Dellinger’s track and place it in a car. Both Appellants subsequently went to the Blount County Jail and obtained Griffin’s release thirty minutes before he was killed. The next day, Appellants and Branam went back to Howie’s hideaway. When Newman stated that she remembered Appellants and Griffin from the previous day, Sutton attempted to get Newman to come with them and when she refused, he threatened her. We conclude that this evidence is clearly sufficient for a rational jury to find beyond a reasonable doubt that, even if Sutton had not fired the shot that killed Griffin, Sutton was criminally responsible for the murder of Griffin by Dellinger because Sutton had aided Del-linger with the intent of promoting or assisting the murder of Griffin. This issue has no merit.[15]
FAILURE TO REMOVE A JUROR
Appellants contend that the trial court erred when it failed to remove a juror whose ex-wife had engaged in misconduct. We disagree.
‘Whether to remove jurors who become or are found to be unable or disqualified to perform their duties lies in the discretion of the trial court.” State v. Forbes, 918 S.W.2d 431, 451 (Tenn.Crim.App.1995) (citation and internal quotations omitted).
The record indicates that at the conclusion of the proof and closing arguments in this case, one of the jurors reported that earlier that day he had received a phone call from his ex-wife in which she had stated that “they” would give him $500.00 in return for a not guilty verdict for Sutton. The juror reported the call to a court officer, and the officer told the juror that he would notify the court and he told the juror not to tell any other jurors about the call.
After the juror explained what had happened, the trial court commended him for the way that he had handled the situation. The trial court then asked the juror how *494 the phone call would affect his feelings about serving on the jury and about following the court’s instructions. The juror responded, “I already told her, it’s not going to change. I’m not going to change what I already decided on. They can take the money and do whatever they want with it. It just made me mad.... ” After this somewhat ambiguous statement, the trial court asked the juror whether he would be able to vote according to the dictates of his conscience based on the proof and the instructions from the court. The juror responded that he would. After a brief bench conference, the trial court asked the juror whether he had told any other jurors about the phone call and the juror responded that he had not. The trial court then asked the juror again whether the phone call would inhibit his ability to reach a verdict based on the facts and the law. The juror responded that it would not.
Appellants’ argument as to why this juror should have been removed is far from clear. However, it appears that their contention is that the juror’s statement that the phone call would not “change what I already decided on” demonstrates that the juror was biased against them and that he had a preconceived judgment about the case. This statement could have any number of meanings in the context in which it was given, including an assertion that the phone call would not affect his ability to be impartial. In any case, the trial court clarified the meaning of the statement by asking the juror about whether the phone call would affect his ability to impartially reach a verdict based on the proof and the court’s instructions about the law. On two occasions, the juror responded that he would follow the law and apply it to the proof that had been presented. Under these circumstances, we conclude that the trial court did not abuse its discretion when it failed to remove this juror. This issue has no merit.
FAILURE TO GRANT A MISTRIAL
Appellants contend that the trial court erred when it failed to grant a mistrial after jurors where exposed to evidence indicating that Appellants had already been tried for the Branam murder. We disagree.
The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn.Crim.App.1996). This Court will not disturb that decision absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn.1990). “Generally, a mistrial will be declared in a criminal case only when there is a ‘manifest necessity’ requiring such action by the trial judge.” State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim.App.1991). “The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict.” State v. Williams, 929 S.W.2d 385, 388 (Tenn.Crim.App.1996). In determining whether there is a “manifest necessity” for a mistrial, “ ‘no abstract formula should be mechanically applied and all circumstances should be taken into account.’ ” State v. Mounce, 859 S.W.2d 319, 322 (Tenn.1993) (citation omitted).
The record indicates that while Larry Muncy was testifying about the chain of custody of various pieces of evidence, he stated that certain evidence had been turned over to Jenny Noe “during the course of the trial.” Defense counsel then objected and moved for a mistrial on the ground that the jurors could assume based on Muncy’s use of the word “trial” that Appellants had previously been charged and tried for the murder of Branam. The court overruled the motion.
*495 The record also indicates that the trial court subsequently received a note from an alternate juror in which the juror indicated that he had seen a bag with the words “not admitted in Sevier County trial” sitting on a table. When the trial court questioned the juror about this incident, the juror stated that because he had seen the bag and because Muncy had previously used the word “trial,” he assumed that there had already been a trial in Sevier County. The juror then stated that he had mentioned the bag to one other juror, but she had given no response. The trial court then asked the juror whether seeing the bag or hearing the word “trial” would have any influence on his ability to base his verdict on the proof presented in this case and the juror responded, “None whatsoever.” Defense counsel renewed the motion for a mistrial and the court overruled it.
Appellants argue that they were entitled to a mistrial based on the authority of State v. Fleece, 925 S.W.2d 558 (Tenn.Crim.App.1995). In Fleece this Court held that a defendant who was convicted of driving under the influence was entitled to a new trial because the prosecutor had improperly created the inference that the defendant had a previous conviction for driving under the influence by repeatedly questioning the defendant about restrictions on his license while waving the folder from the previous case in front of the jury. Id. at 560-61. The two incidents in this case fall far short of the impermissible conduct of the prosecutor in Fleece. Unlike the intentional conduct by the prosecutor in Fleece, there is no indication that Muncy’s use of the word “trial” and the placement of the bag on the table were anything more than inadvertent mistakes. Further, the use of the word trial and the writing on the bag did not create any inference whatsoever about the verdict in the Sevier County trial. In fact, when the trial court specifically asked the juror whether anything he had seen or heard had indicated what the outcome of the Sevier County trial had been, the juror responded no. Under these circumstances, we conclude that the trial court did not abuse its discretion when it ruled that there was no “manifest necessity” for a mistrial in this case. This issue has no merit.
THE STATE’S CLOSING ARGUMENT DURING THE GUILT PHASE
Appellants contend that the State’s closing argument was improper and prejudicial. We conclude that Appellants have waived this issue.
Initially, we note that the record indicates that Appellant’s did not make a single objection to anything that either of the two prosecutors said during their closing arguments. By failing to make a contemporaneous objection, Appellants waived this issue. See State v. Farmer, 927 S.W.2d 582, 591 (Tenn.Crim.App. 1995[1996]); Tenn. R.App. P. 36(a). Moreover, Appellants have failed to identify which of the two prosecutors gave the allegedly improper argument and they have failed to identify even a single statement that they claim was improper. It is not the function of this Court to speculate as to what portions of the arguments Appellants would contend were improper. By failing to include appropriate citations to the record, Appellants have waived this issue. Tenn. Ct.Crim.App. R. 10(b).
FAILURE TO INSTRUCT ON A LESSER INCLUDED OFFENSE
Appellant Sutton contends that the trial court erred when it failed to instruct the jury on the lesser included offense of facilitation of a felony. We disagree.
*496 Tennessee Code Annotated section 39-11^403 provides in relevant part that
A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.
TenmCode Ann. § 39-ll-403(a) (1991). As previously noted, the intent required for criminal responsibility under section 39-11-402(2) is “intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense.” Tenn.Code Ann. § 39-11-402(2) (1991).
In State v. Burns, 6 S.W.3d 453 (Tenn. 1999) the Tennessee Supreme Court concluded that an offense is a lesser-included offense of another if:
(a) all of its statutory elements are included within the statutory elements of the offense charged; or
(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
(1) a different mental state indicating a lesser kind of culpability; and/or
(2) a less serious harm or risk of harm to the same person, property or public interest; or
(c) it consists of
(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
(2) an attempt to commit the offense charged or an offense that otherwise meets the definition in part (a) or (b); or
(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).
Id. at 466-67. The supreme court thus concluded, and recently reiterated, that facilitation is a lesser-included offense when a defendant is charged with criminal responsibility for the conduct of another. Id. at 470; State v. Fowler, 23 S.W.3d 285, 288 (Tenn.2000).
“This does not mean, however, that an instruction must be given simply because an offense is a lesser-included offense of another.” Fowler, 23 S.W.3d at 288. “First, the trial court must determine whether ‘any evidence exists that reasonable minds could accept as to the lesser included offense.’ ” Id. at 289 (citing Burns, 6 S.W.3d at 469). “Second, the trial court must determine whether the evidence viewed in this, light is legally sufficient to support a conviction for the lesser-included offense.” Id.
In this case, there is absolutely no evidence in the record from which a rational jury could conclude that Dellinger forced Sutton to participate in the murder against his will. Further, we hold that a rational jury could not conclude from the evidence in the record that Sutton was merely a bystander during the murder of Griffin. The State’s theory of the case, which was supported by extensive proof, was that Dellinger and Sutton acted in unison with a common purpose and design to kill Griffin. Indeed, the State’s theory was that both Appellants fought with Griffin, attempted to bail Griffin out of jail, set fire to Griffin’s trailer, transferred the murder weapon from a truck to a car, successfully bailed Griffin out of jail, and then were present while one of them fired the fatal shot. The defense theory for both Appellants was that neither one of them committed the murder. Indeed, much of the defense proof went to establishing that they were friends with Griffin and had no rea *497 son to kill him, that Griffin died long after he was last seen with Appellants, and that there were several other possible culprits in this ease. Thus, the evidence in the record created an “all or nothing” situation in which Sutton and Dellinger both actively participated and promoted the murder of Griffin or neither one of them did. There is simply no evidence in the record from which a rational jury could conclude that Sutton provided substantial assistance to Dellinger without having the intent to promote or assist the commission of the offense. Therefore, the trial court did not err when it failed to instruct the jury on the lesser included offense of facilitation of a felony. This issue has no merit.
SPECIAL INSTRUCTION ON REBUTTAL EVIDENCE
Appellants contend that the trial court erred when it failed to give the jury a special instruction about rebuttal evidence. We conclude that Appellants have waived this issue.
Appellants claim that the trial court should have instructed the jury that it could only consider the State’s rebuttal evidence for the impeachment of defense witnesses and it could not consider the testimony as substantive evidence. However, Appellants have failed to provide a specific explanation for why this instruction should have been given. In addition, Appellants have failed to cite any authority for their proposition that this instruction should have been given and they have also failed to provide a proper citation to the record. Thus, Appellants have waived this issue. Tenn. Ct.Crim.App. R. 10(b).
SPECIAL INSTRUCTION ON “LAST SEEN ALIVE”
Appellants contend that the trial court erred when it refused to instruct the jury that it could not convict Appellants simply because Griffin was last seen alive in their presence. We disagree.
The record indicates that the trial court refused to give this special instruction because “the charge sets out very clearly ... what has to be proven to establish guilt.” Indeed, the charge clearly instructs the jury that it can only convict Appellants of an offense if the State proves the elements of that offense beyond a reasonable doubt. In addition, the charge clearly instructs the jury on the elements of first degree murder and its lesser included offenses and the charge also instructs the jury about criminal responsibility for the conduct of another. In short, the charge accurately and correctly instructs the jury on burden of proof, presumption of innocence, elements of the offenses, and the nature of different kinds of evidence. “When the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party.” State v. Bohanan, 745 S.W.2d 892, 897 (Tenn.Crim.App.1987). This issue has no merit.
CHARGING THE JURY ON SUNDAY
The record indicates that the proof was closed and closing arguments were made on Saturday, August 31, 1996. After the trial court informed the jury that it would be instructed the next day, court was adjourned at 8:55 p.m. Court was resumed at 1:15 p.m. on Sunday, September 1, 1996, and the trial court immediately conducted the hearing about the juror who had been contacted by his ex-wife. Shortly thereafter, the trial court charged the jury. The jury began deliberations at 2:20 p.m. and returned with the verdicts at 7:35 p.m.
Following this Court’s decision in State v. Debiasi Sinard King & Dewayne King,
*498 No. 03C01-9801-CR-00015, 1999 WL 281080 (Tenn.Crim.App., at Knoxville, April 30, 1999), the Appellants raised the issue of whether the trial court’s having instructed the jury on a Sunday coupled with the jury’s deliberations and return of verdicts on Sunday required a new trial. In that case this Court held that as late as 1965 the Tennessee Supreme Court reaffirmed the ancient common law rule that judicial proceedings conducted on a Sunday are void. See Smith v. State, 215 Tenn. 314, 385 S.W.2d 748 (1965). As of the time of this Court’s decision in King, this rule had not been altered by either the legislature or the Tennessee Supreme Court. Thus, this Court granted a new trial to the defendants in King since a portion of their trial had occurred on a Sunday.
When the Appellants raised this issue by way of a supplemental brief this Court ordered a response by the State. The State responded, conceded that the instant case was indistinguishable from King, but indicated that it was pursuing an appeal to the Tennessee Supreme Court in the King case. The State asked this Court to stay its decision in the instant case until such time as our Supreme Court resolved the issue of the propriety of Sunday court proceedings. Without objection from the Appellants, this Court granted the State’s request to stay our opinion in this case until the Tennessee Supreme Court resolved this issue.
On January 19, 2001, the Tennessee Supreme Court handed down its decision in State v. Debiasi Sinard King and Dewayne King, [40 S.W.3d 442] (Tenn.2001). In that decision the Court rejected a per se rule invalidating Sunday Court proceedings. The Court held whether to conduct court proceedings on a Sunday rests within the discretion of the trial court. The Court went on to hold:
In exercising this discretion, the trial court should be deferential to the preferences of the litigants, witnesses, jurors, and attorneys and must be mindful of the need for every participant in a trial proceedings to be prepared and rested. The trial court must also respect and accommodate the genuinely-held religious view of any litigant, witness, juror, or attorney. Finally, the trial court must weigh all of these concerns against whatever pressing need or compelling interest may necessitate a Sunday proceeding.
Id. at * 8[444]
In the instant case the trial had been lengthy and hard fought. The jury had been sequestered. When the trial court proposed giving his instructions to the jury and having the jury deliberate on Sunday the jurors indicated that was fine with them. No attorney or either of the Appellants voiced any objection to the Sunday proceedings. The trial court made appropriate arrangements for jurors who wished to attend religious services. Under these circumstances, we find no abuse of discretion in conducting Sunday court proceedings in the instant case. This issue is without merit.
USE OF APPELLANTS’ CONVICTIONS FOR THE BRANAM MURDER IN SENTENCING
Appellants contend that the trial court erred when it allowed the State to introduce their convictions for the Branam murder into the sentencing phase of trial. We disagree.
Appellants contend that because the trial court allowed the State to introduce facts about the Branam murder into evidence in order to establish the identity of Griffin’s killers, the trial court should not have allowed the State to introduce Appel *499 lants’ convictions for the Branam murder during the sentencing phase of trial in order to establish the aggravating circumstance that Appellants had previously been convicted of a felony involving violence to the person.[16] As authority for this proposition, Appellants cite State v. Bigbee, 885 S.W.2d 797 (Tenn.1994), in which the Tennessee Supreme Court held that when the State is seeking imposition of a death sentence on the basis that the defendant has previously been convicted of a felony involving violence to the person, the State may not introduce evidence about the specific facts of the prior crime during the sentencing phase when the conviction shows on its face that it involved violence to the person. Id. at 811.
We conclude that Appellants’ reliance on Bigbee is misplaced. Nothing in Bigbee prevents the State from relying on a previous conviction for a felony involving violence to the person as an aggravating circumstance after the State has introduced the facts of the prior conviction during the guilt phase of trial in order to establish an element of first degree murder. Rather, Bigbee simply precludes the State from introducing the specific facts of the prior offense during the sentencing phase itself. Indeed, the State fully complied with this requirement. The record indicates that the State introduced no evidence about the specific facts of the Branam murder during the sentencing phase and the prosecutors made no mention of the specific facts during their closing arguments. Instead, the State merely used Appellants’ convictions to establish that Dellinger had one prior conviction for felonies involving violence against the person and that Sutton had two prior convictions for a felony involving violence to the person.[17] Further, the trial court instructed the jury that in imposing sentence, it could only consider “any of the statutory aggravating circumstances which have been raised during the sentencing phase” and that it “shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate in this case.” The jury is presumed to have followed those instructions. See State v. Nesbit, 978 S.W.2d 872, 885 (Tenn.1998). Under these circumstances, we conclude that the trial court did not err when it allowed the State to introduce Appellants’ convictions for the Branam murder during the sentencing phase. This issue has no merit.[18]
*500 THE STATE’S CLOSING ARGUMENT DURING THE SENTENCING PHASE
Appellants contend that the State’s closing argument during the sentencing phase was improper and prejudicial. We disagree.
Initially, we note that the record indicates that Appellants did not make a single objection to anything that either of the two prosecutors said during their closing arguments during the sentencing phase. By failing to make a contemporaneous objection, Appellants waived this issue. Farmer, 927 S.W.2d at 591; Tenn. R.App. P. 36(a). However, notwithstanding waiver, we conclude that Appellants are not entitled to relief even on the merits.
Essentially, Appellants claim that the closing arguments of both prosecutors were improper because they included references to the fact that each Appellant had been previously convicted of first-degree murders. As support for this proposition, Appellants cite State v. Smith, 755 S.W.2d 757 (Tenn.1988) and State v. Bigbee, 885 S.W.2d 797 (Tenn.1994). However, Smith and Bigbee are clearly distinguishable from this case. In Smith, the Tennessee Supreme Court held that because the jury had been informed that the defendant had received a life sentence for one murder conviction, it was improper for the prosecutor to argue that the jury would be imposing no punishment at all if it imposed another life sentence for the’ second murder conviction. 755 S.W.2d at 767[-]68. In Bigbee, the supreme court held that the prosecutor’s argument was improper because he had strongly implied that imposition of a death sentence for a second murder conviction would be an appropriate way to punish the defendant for a previous murder conviction for which the defendant received a life sentence. 885 S.W.2d at 812. The prosecutors in this case did neither of these things. First, the prosecutors never mentioned the fact that Appellants had received a life sentence for the Branam murder and they never argued that imposition of a life sentence in this case would be no punishment at all. Second, the prosecutors never stated or implied that imposition of a life sentence for the Griffin murder would be an appropriate punishment for the Branam murder. Instead, the prosecutors only mentioned the Branam murder in the context of arguing that because the State had proven the existence of the aggravating circumstance and had proven that the aggravating circumstance outweighed the mitigating circumstances, the death sentence was the appropriate sentence in this case. There is nothing improper about arguing that the existence of the prior conviction as an aggravating circumstance supports imposition of a death sentence. See id. This issue has no merit.
FAILURE TO INFORM THE JURY ABOUT THE PREVIOUS LIFE SENTENCE
Appellants contend that the trial court erred when it faked to instruct the jury that Appellants had received life sentences for their convictions in the Branam murder case. We disagree.
Appellants concede that under current law, the trial court properly refused to instruct the jury about the sentences in the Branam murder case. Indeed, the Tennessee Supreme Court has specifically held that it is improper to inform a jury in a capital case that the defendant received a life sentence for a previous first degree murder conviction. State v. Smith, 857 S.W.2d 1, 24-25 (Tenn.1993). This Court has neither the authority nor the desire to overrule the supreme court on this issue. This issue has no merit.
*501 (Deleted Discussion of Instruction about Proof of Identity)
(Deleted Discussion of Proof of Appellants’ Identities)
INSTRUCTION ON REASONABLE DOUBT DURING SENTENCING
Appellants contend that the trial court erred when it instructed the jury about reasonable doubt during the sentencing phase of trial. We disagree.
In its charge to the jury dining the sentencing phase, the trial court instructed the jury that
The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case, and is an inability after such investigation to let the mind rest easily.
It is not necessary that the aggravating circumstance or circumstances be proved beyond all possible doubt, as absolute certainty is not demanded by the law.
A reasonable doubt is just that — a doubt that is reasonable after an examination of all the facts of this case.
Appellants contend that this charge was improper in that the use of the phrase “let the mind rest easily” violated their right to due process because the fact that the phrase is not qualified or otherwise explained makes the instruction impermissi-bly vague and ambiguous.
Tennessee courts have repeatedly upheld the use of the phrase “let the mind rest easily” in instructions about reasonable doubt. In State v. Bush, 942 S.W.2d 489 (Tenn.1997), the Tennessee Supreme Court held that the trial court did not err when it instructed the jury that
Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every element of proof necessary to constitute the offense.
Id. at 520-21. Similarly, in State v. Nichols, 877 S.W.2d 722 (Tenn.1994), the supreme court held that the trial court did not err when it instructed the jury that it must find proof “beyond a reasonable doubt” and be convinced to a “moral certainty” of the existence of the aggravating circumstances and of the fact that they outweighed the mitigating circumstances in conjunction with an instruction that “[rjeasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict.” Id. at 734. The supreme court stated that “[t]he context in which the instruction was given clearly conveyed the jury’s responsibility to decide the verdict based on the facts and the law.” Id. Further, in Pettyjohn v. State, 885 S.W.2d 364 (Tenn.Crim.App.1994), this Court held that the trial court did not err when it instructed the jury that
Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this *502 certainty is required as to every proposition of proof to constitute the offence [sic].
It is not necessary that each particular fact should be proved beyond a reasonable doubt[ ] [i]f enough facts are proved to satisfy the jury beyond a reasonable doubt, of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified that [sic] circumstances taken together must be of a conclusive nature and tendency, leading on the whole to satisfactory conclusion and producing in effect a “moral certainty” that the defendant committed the offence [sic].
Id. at 365-66.
We conclude that, just like the instructions in Bush, Nichols, and Pettyjohn, the instruction in this case was proper because it sufficiently informed the jury about the standard against which it was to examine the evidence. Contrary to Appellants’ contention, the fact that the phrase “let the mind rest easily” was not qualified in this case by something such as “to the certainty as to the establishment of the aggravating factor” does not make the statement impermissibly vague. As stated by the supreme court in Bush, “[i]n order to meet the requirements of due process, the jury instructions must be examined as a whole, without considering particular phrases out of context.” 942 S.W.2d at 521. It is absolutely obvious that when the phrase “let the mind rest easily” is considered in context, it is referring to the jury’s determination, based on a consideration of all the evidence, that the State has satisfied its burden of establishing the existence of the aggravating circumstance and establishing that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. In short, the trial court’s instruction on reasonable doubt properly reflects the evidentiary certainty required by principles of due process. This issue has no merit.[19]
(Deleted Discussion of Failure to Instruct the Jury That Appellants Are Human Beings)
(Deleted Discussion of Failure to Answer the Jury’s Question)
WHETHER THE AGGRAVATING FACTOR APPLIED BY THE JURY IS A DUPLICATION OF THE CRIME
Appellants contend that their death sentences are unconstitutional because the aggravating circumstance applied by the jury is a duplication of the offence for which they were convicted. We disagree.
Although Appellants’ argument is not entirely clear, they apparently contend that because the State used evidence of the Branam murder to show that they were the individuals who killed Griffin, the State was precluded from relying on their convictions for the Branam murder as the aggravating circumstance upon which the death penalty was sought. As support for this proposition, Appellants cite State v. Middlebrooks, 840 S.W.2d 317 (Tenn.1992). This reliance is completely misguided. In *503 Middlebrooks, the Tennessee Supreme Court held that when a defendant is convicted of first degree murder solely on the basis of felony murder, the defendant cannot be sentenced to death because that same murder was committed during the commission, the attempt to commit, or the fleeing after the commission or attempt to commit certain felonies. Id. at 847. First, Appellants were convicted of premeditated and deliberate first degree murder, not felony murder. In addition, Appellants were convicted in this case of the Griffin murder, not the Branam murder. Thus, it is obvious that the aggravating circumstance in this case (the convictions for the Branam murder) was not a duplication of the crime for which Appellants were convicted in this case (the Griffin murder). This issue has no merit.
DOUBLE JEOPARDY
Appellants contend that the imposition of the death sentence in this case violates principles of double jeopardy. We conclude that Appellants have waived this issue.
Appellants have failed to support their contention with any argument other than a one sentence conclusory statement that their death sentences violate principles of double jeopardy. In addition, Appellants have failed to cite to the record and they have failed to cite any authority in support of their claim. Thus, this issue is waived. Tenn. R. Ct.Crim.App. 10(b).
FAILURE TO CONDUCT AN ADDITIONAL SENTENCING HEARING
Appellants contend that the trial court erred when it failed to hold a separate sentencing hearing to determine whether their death sentences should be served concurrently with or consecutively to their life sentences for the Branam murder. We disagree.
Appellants have not cited any authority that would support their proposition that the trial court was required to conduct a separate sentencing hearing. Indeed, the statutes that govern capital sentencing do not provide for such a hearing. Quite simply, nothing in the law of this State required the trial court to conduct a separate sentencing hearing and thus, the court did not err in failing to do so. This issue has no merit.[20]
(Deleted Discussion of Sentence Review Pursuant to Tennessee Code Annotated Section 39 — 13—206(c)(l)(1997))
CONCLUSION
Based on the foregoing the judgment and sentence of the trial court is AFFIRMED.

. "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument....” Tenn. R. Sup.Ct. 12.2.

. We note that Dellinger and Sutton have incorporated by reference sections of their Court of Criminal Appeals brief. We take this opportunity to discourage this practice among parties before this Court. See State v. Sledge, 15 S.W.3d 93, 96 n. 2 (Tenn.2000).

. These convictions were for the murder of Connie Branam.

. Dellinger and Sutton cite State v. Blouvett, 904 S.W.2d 111, 112 (Tenn. 1995), holding that a "prior conviction” under Tenn.Code Ann. § 40 — 35—106(b)(1) means a conviction that has been adjudicated prior to the commission of the offense for which sentence is to be imposed. The holding in Blouvett, however, is limited to the specific statutes referenced in that opinion for sentencing felony offenders under the Tennessee Criminal Sentencing Reform Act of 1989. The opinion is not relevant to our discussion of Tennessee's capital sentencing procedure.

. The amended language of § 39-13-204(e)(l) prohibiting reviewing courts from vacating a sentence on the ground that the trial court failed to instruct the jury as to a non-statutory mitigating factor was not in effect at the time of the commission of the offense in this case.

. Initially, we note that a trial court does not have any discretion to grant a motion for separate juries during the guilt and sentencing phases of trial. Indeed, Tennessee law specifically requires that following a conviction for first degree murder, a “sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt.” Tenn.Code Ann. § 39-13-204(a) (1991).

. We note that it is well-settled that a criminal defendant's constitutional rights are not violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath. See State v. Hutchison, 898 S.W.2d 161, 167 (Tenn.1994) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)).

. At the time of the homicides Tennessee Code Annotated section 39-13-204 provided, in relevant part, that the jury shall impose a sentence of death if it finds that the State has proven beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Tenn.Code Ann. § 39-13-204(g)(l) (1991).

. We note that even if we were to find that principles of equal protection were applicable, we would still find that requiring capital defendants to be sentenced immediately by a jury does not violate the right to equal protection. When no suspect class and no fundamental right is involved, a classification by the State is valid if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it. See State v. Tester, 879 S.W.2d 823, 828-29 (Tenn. 1994). Capital defendants are not a suspect class for equal protection analysis and there is no fundamental right to be sentenced by a judge in a separate sentencing hearing. In addition, requiring capital defendants to be sentenced immediately by a jury is neither arbitrary nor unreasonable. Thus, the sentencing procedure for capital defendants does not violate the right to equal protection.

. This article is not in the record.

. Initially, we note that because the record only contains parts of the voir dire, our review is limited.

. Tennessee Code Annotated section 39-13-203 prohibits imposition of a death sentence on any defendant who, at the time of the offense, had an IQ level of 70 or less, had deficits in adaptive behavior, and had mental retardation manifested during the developmental period or by age eighteen. Tenn.Code Ann. § 39-13-203(a)(b) (1991).

. Although it is not clear, Appellants apparently do not challenge the trial court’s compliance with the procedural aspects of Rule 404(b) and instead, they only challenge the trial court’s conclusion that the evidence was relevant to issues other than Appellants’ characters and that the probative value of the evidence was not outweighed by danger of unfair prejudice. Thus, we do not address the trial court's compliance with Rule 404(b)'s procedural requirements. Indeed, although the record indicates that the trial court conducted a hearing on this issue, the record only contains a brief excerpt of the hearing. Therefore, we would be precluded from reviewing the trial court's compliance with the procedural requirements even if Appellants had challenged it. It is the duty of the party seeking appellate review to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues raised by the party. State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993); State v. Roberts, 755 S.W.2d 833, 836 (Tenn.Crim.App.1988). When the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, this Court is precluded from considering the issue. State v. Matthews, 805 S.W.2d 776, 784 (Tenn.Crim.App.1990).

. Appellants also contend that evidence about Branam’s murder was inadmissible because the State failed to prove that the body that was found in the burned vehicle was that of Branam. However, Dr. Bass testified that the body had been identified as that of Branam by use of dental records. Although Appellants now claim that Dr. Bass’s identification of the body was improper, the record indicates that Appellants did not object to Dr. Bass's testimony or otherwise contest his identification of the body. Thus, they have waived any objection to the identification of Branam’s body by Dr. Bass. See Tenn. R.App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party ... who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.”).

. Appellants contend that because Griffin's statements were given in response to Roberts’ questions, the statements were not spontaneous and thus, were not made while under stress or excitement. However, the Tennessee Supreme Court stated in Gordon that “statements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event.” 952 S.W.2d at 820-21.

. The record indicates that although Appellants made one vague reference to hearsay during the bench conference, that was clearly not the basis of their objection to this evidence.

. In support of their argument that Dr. Harlan should not have been allowed to testify during rebuttal because he could have testified during the State’s case in chief, Appellants cite State v. West, 825 S.W.2d 695 (Tenn.Crim.App.1992). However West is distinguishable from this case because in West, this Court held that the testimony during rebuttal was improperly admitted because the testimony did not rebut anything and thus, it should have been proffered during the State’s case in chief. Id. at 698. In this case, Dr. Harlan’s testimony clearly rebutted the testimony of Dr. Wolfe.

. A 1995 amendment eliminated deliberation as an element of first-degree murder. See Tenn.Code Ann. § 39 — 13—202(a)(1) (1997) (“First degree murder is: A premeditated and intentional killing of another.”).

. Although it is not clear, Appellants apparently claim that the evidence was also insufficient because the State failed to prove that the body found in the Blue Hole area was that of Griffin. We reject this contention because the evidence clearly shows that the State established that the body was that of Griffin.

. Appellant Sutton also contends that the trial court erred when it failed to grant their motion for judgment of acquittal. A motion for judgment of acquittal requires that the trial court determine the sufficiency of the evidence. Tenn. R.Crim. P. 29(a). For the same reasons we conclude that the evidence was sufficient to support Appellants’ convictions, we also conclude that the trial court did not err when it failed to grant the motion for judgment of acquittal.

. Tennessee Code Annotated section 39-13-204 provided that one of the aggravating circumstances that can be used as a basis for imposing a death sentence is the fact that the defendant has previously been convicted of one or more felonies whose statutory elements involve the use of violence to the person. Tenn.Code Ann. § 39-13-204(i)(2) (1991).

. The State introduced evidence that Sutton had a prior conviction in Georgia for aggravated assault.

. In a related issue, Appellants contend that the trial court erred when it failed to strike the State’s notice of intent to seek the death penalty. Specifically, Appellants contend that because the trial court had ruled that the State would be allowed to introduce facts about the Branam murder into evidence in order to establish the identity of Griffin’s killers, the trial court should have stricken the State's notice of intent to seek the death penalty because it relied on Appellants’ convictions for the Branam murder as the aggravating circumstance upon which the death penalty was sought. For the same reasons that we conclude that the trial court did not err when it allowed the State to introduce Appellants’ convictions for the Branam murder into evidence during the sentencing phase, we also conclude that the trial court did not err when it failed to strike the State’s notice of intent to seek the death penalty.

. In a related issue, Appellants contend that the trial court erred when it refused to consider their motion challenging the validity of this jury instruction even though the motion was not filed until after the trial court had conducted a hearing on their motion for a new trial and denied the motion for a new trial. However, Rule 33(b) of the Tennessee Rules of Criminal Procedure clearly states that a motion for a new trial must be in writing, must be made within thirty days of sentencing, and amendments to the motion shall be allowed until the day of the hearing on the motion. Thus, the trial court did not err when it refused to consider the motion that was filed after the hearing on the motion for a new trial. In any case, Appellants’ challenge to the jury charge has no merit.

. We note that because the judgments in this case do not expressly indicate whether the death sentences are to be served concurrently with or consecutively to the previously imposed sentences, the death sentences are to run concurrently with the other sentences. Term. R.Crim. P. 32(c)(2).