IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2006

## STATE OF TENNESSEE v. THADDEUS JOHNSON

Direct Appeal from the Criminal Court for Shelby County
No. 03-00441-42     Arthur T. Bennett, Judge

No. W2005-01600-CCA-R3-CD  - Filed June 30, 2006

The defendant, Thaddeus Johnson, was convicted of first degree premeditated murder and attempted first degree murder.  He received a sentence of life imprisonment for his murder conviction and a consecutive twenty-five year sentence for his attempted murder conviction.  On appeal, the defendant presents the following issues for review: (1) the trial court committed plain error by admitting hearsay statements from non-testifying co-defendants; (2) the evidence was insufficient to convict the defendant of first degree premeditated murder and attempted first degree murder; and (3) the trial court erred in ordering consecutive sentencing.  Upon review of the record, parties' briefs and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which Norma McGee Ogle and Alan E. Glenn, JJ., joined.

Juni S. Ganguli (on appeal), Memphis, Tennessee, and Larry Fitzgerald (at trial), Memphis, Tennessee for the appellant, Thaddeus Johnson.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman and Ray Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At trial, Lucille Nevels testified that her twenty-two-year-old nephew, Montreal Graham, was shot and killed at the Oakshire Apartments in April of 2002.  Clarence Stuckey testified that he was hanging out at the Oakshire Apartments with Graham, Antonio Taylor and Maurice Wooten.  During this time, he heard gunshots and fled the area.  When he returned to the apartments, he learned that his friend, Graham, had been shot and killed.  Stuckey did not know who fired the shots, but he

recalled that he saw a gray Crown Victoria, owned by Jarvis Harris, drive by the apartments earlier that day. Police Officer Frankie Mohammad testified that he responded to the shooting at the Oakshire Apartments and discovered Graham lying between two apartment buildings in an area known as the "cut." Graham had been shot in the head and was pronounced dead.

Eric Cooper testified that he was a good friend of the co-defendant, Jarvis Harris. He also testified that he knew the defendant and co-defendant, Maurice Thomas. According to Cooper, he and Harris were hanging out on April 11, 2002, driving around in Harris's gray Crown Victoria. Later, around 7:00 p.m., Harris picked up the defendant. The group then drove to the Oakshire Apartments to pick up Thomas. While there, Wooten was seen standing on the street near the apartments. After Thomas was picked up, he directed Harris to his home and retrieved some black clothes. At this point, Cooper began to suspect that something was going on and it involved Wooten.

Cooper testified that the group drove back to the Oakshire Apartments. There, Harris, the defendant, and Thomas got out of the car and had a conversation; whereupon, the defendant and Thomas changed into black clothing and walked off. As the defendant and Thomas were leaving, Harris told the defendant to call him "when they get through." Harris then drove Cooper to Cooper's apartment across the street. While waiting at the apartment, Cooper heard about six gunshots. Afterward, Harris received a phone call from the defendant. Harris and Cooper then drove to Granny's Market where Cooper saw the defendant and Thomas run across the street with guns and get into the car. Once in the car, Cooper heard the defendant exclaim, "I shot that bitch." Then, in response to hearing Harris tell him that he shot the wrong person, the defendant said, "f**k it." Cooper also heard Thomas tell Harris that his gun jammed.

Cooper testified that Harris drove the group to a hotel room. There the defendant and Thomas changed clothes. According to Cooper, Harris and the defendant started arguing about the defendant's actions in shooting the wrong person. After the defendant burned his black clothes behind the hotel, the group left. Later, Cooper learned that Wooten had been the intended target of the shooting because of a dispute between Harris and Wooten.

Tequila Wilder, the defendant's former girlfriend, testified that on April 11, 2002, the defendant hung out with her until 7:00 p.m., then he left. The next morning, the defendant called her and asked her to tell the police that he was with her on April 11th. Wilder stated that she initially told police that the defendant spent the night with her, but she later changed her mind and told the police that the defendant was not with her.

Police Officers Shan Tracy and Danny James testified that they recovered evidence relevant to the shooting of Graham. Graham's cell phone was recovered with bullet fragments in it. Bloody shirts were recovered from the crime scene, and burned clothing was collected from behind the Shelby Inn Motel.

Police Officer Anthony Craig testified that Harris became a suspect in the shooting death of Graham after Wooten told police about a prior altercation Harris had with him a few days before the

shooting. After being questioned by police, Harris then implicated the defendant as a suspect. Officer Craig testified that he interviewed the defendant. According to Officer Craig, the defendant initially told him that he was with his girlfriend the day of the shooting. However, after learning that his girlfriend changed her story about his whereabouts, the defendant gave a written statement indicating his involvement in the shooting. According to the defendant's written statement, he participated in the shooting after Harris put a $200,000.00 "contract" on Wooten. Harris also provided the clothes and handguns for the defendant and Thomas. According to the defendant's statement, Thomas fired a .38 revolver once and shot Graham in the head. The defendant shot a .32 automatic handgun until it was empty but did not know if any rounds he fired struck Graham. The defendant also said he fired six times at Wooten and his brother. Afterward, Harris took the defendant to a hotel room and told him to change clothes so he could burn them.

Dr. Teresa Campbell, a forensic pathologist, testified that Graham's autopsy revealed that he suffered gunshot injuries to his head and leg. After being shot, Graham lost consciousness then died. Graham's autopsy also revealed alcohol and cocaine in his bloodstream. Alex Brodhag, an expert firearms and ballistic examiner for the Tennessee Bureau of Investigation, testified that the bullets recovered from Graham's body came from .38 caliber and .32 caliber handguns.

## ANALYSIS

### I. Plain Error

The defendant argues that the trial court committed error by admitting hearsay statements from non-testifying co-defendants. Specifically, the defendant points to Eric Cooper and Police Officer Anthony Craig's testimony concerning statements made by co-defendants, Jarvis Harris and Maurice Thomas. The defendant concedes that no objections were raised at trial or in the motion for new trial, but he contends that these errors rise to the level of plain error.

We begin our review by noting that a "criminal defendant who has failed to properly preserve the relevant issue is limited to seeking relief via plain error review." *State v. Gomez*, 163 S.W.3d 632, 645 (Tenn. 2005); *see also* Tenn. R. Crim. P. 52(b). "Plain error review extends only to a clear, conspicuous, or obvious error which affects the substantial rights of the defendant." *Gomez*, 163 S.W.3d at 645 (citation omitted). The criteria for finding plain error are difficult to satisfy. We will not recognize plain error unless the following five factors are established:

> (a) the record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established, and consideration of all five factors

is unnecessary if any one factor indicates that relief is not warranted. *Id*. at 283. The defendant has the burden of proving the existence of plain error. *See Gomez*, 163 S.W.3d at 646. In order for this court to find plain error, the error must be of such a great magnitude that it probably changed the outcome of the proceedings. *See Adkisson*, 899 S.W.2d at 642.

### A. Cooper's Testimony

At trial, Cooper testified that he heard the following conversation between the defendant and co-defendants, Harris and Thomas:

| | |
|---|---|
| Prosecutor: | Was there a conversation at that point? |
| Cooper: | Yes, sir. |
| Prosecuror: | And what was that conversation? |
| Cooper: | Well, [the defendant] was like I shot that bitch. |
| Prosecutor: | [The defendant] said that? |
| Cooper: | Yes, sir. |
| Prosecutor: | What was said next? |
| Cooper: | Then Jarvis [Harris] like, who did you shoot? . . . |
| | . . . . |
| | Then that was when Jarvis, like, that's the wrong person. |
| Prosecutor: | And did [the defendant] make a response to that? |
| Cooper: | He was like, f**k it. |
| Prosecutor: | And how about Maurice Thomas, did he say anything? |
| Cooper: | He was like his gun f**ked up. |

Upon review, we reject the defendant's contention that the admission of this testimony was plain error. In the instant case, the defendant has not demonstrated that a clear and unequivocal rule of law has been breached or that the complained error affected his substantial rights. First, the defendant's statements to his co-defendants, although hearsay, are admissible as party-opponent admissions. *See* Tenn. R. Evid. 803(1.2)(A). Second, the defendant has not shown that his co-defendants' statements are hearsay; that is, whether the statements were offered for the truth of the matter asserted. *See id*. 801(c). It remains unclear whether the co-defendants' statements were offered for the truth of their content or offered to provide context to the defendant's statements and describe, firsthand, the defendant's interactions with his co-defendants. Third, even assuming the co-defendants' statements were hearsay, these statements appear to be admissible as statements by co-conspirators made during the course of and in furtherance of the conspiracy. *Id*. 803 (1.2)(E). Statements of a co-conspirator are admissible as a hearsay exception when: (1) there is evidence of the existence of the conspiracy and the connection of the declarant and the defendant to it; (2) the declaration was made during the pendency of the conspiracy; and (3) the declaration was made in furtherance of the conspiracy. *State v. Berry*, 141 S.W.3d 549, 585 (Tenn. 2004). A "statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, *update other conspirators on the progress*, *deal with arising problems*, and provide information relevant to the

project." *State v. Carruthers*, 35 S.W.3d 516, 556 (Tenn. 2000) (emphasis added). A conspiracy can be proven by showing an implied understanding between the parties. *See State v. Gaylor*, 862 S.W.2d 546, 553 (Tenn. Crim. App. 1992). Given the fact that the defendant has not demonstrated the breach of a clear and unequivocal rule of law or shown how the error affected his substantial rights, we conclude that the admission of the co-defendants' statements do not rise to the level of plain error.

### B. Officer Craig's Testimony

At trial, Officer Craig testified that during the course of the homicide investigation, he and other investigating officers talked with Harris, who "basically gave us the name of [the defendant] as another individual involved." In this instance, the defendant, citing *Bruton v. United States*, 391 U.S. 123 (1968), contends that plain error review is appropriate because this testimony was hearsay and violated his constitutional right to confront witnesses against him. Upon review, we cannot ascertain how this testimony constitutes hearsay or violates *Bruton*. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In *Bruton*, the United States Supreme Court held that the admission of a co-defendant's statement incriminating the defendant violates the defendant's constitutional right to confrontation of witnesses when the co-defendant is not available to testify. *Bruton*, 391 U.S. at 136-37. Here, Officer Craig simply testified as to how the defendant became a suspect during the course of the homicide investigation. Therefore, Officer Craig's testimony regarding his first-hand observations and experiences is not hearsay. Also, Officer Craig did not testify to any co-defendant statement which incriminated the defendant. As such, Officer Craig's testimony neither raises *Bruton* concerns nor rises to the level of plain error.

In sum, plain error does not exist unless the error is of such "great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642. Having reviewed the record, we discern no plain error. Therefore, the defendant is not entitled to relief on this issue.

### II. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient to convict him of first degree premeditated murder and attempted first degree murder because there was no proof of premeditation. Upon review of this issue, we reiterate the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves

all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

Relevant to the case herein, first degree murder includes the "premeditated and intentional killing of another" or a "*killing of another* committed in the perpetration of or *attempt to perpetrate any first degree murder . . . .*" Tenn. Code Ann. § 39-13-202(a)(1)-(2) (emphasis added). Premeditation refers to "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation "means that the intent to kill must have been formed prior to the act itself." *Id*. However, the intent to kill may be formed in an instant and need not pre-exist in the mind of the accused for any definite period of time. *Id*. The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *Bland*, 958 S.W.2d at 660. Among the circumstances supporting premeditated murder are: a motive for the killing; the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. *See State v. Dellinger*, 79 S.W.3d 458, 492 (Tenn. 2002); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998); *Bland*, 958 S.W.2d at 660. Criminal attempt is explained as follows:

> (a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101. In other words, criminal attempt requires the existence of the same culpability required for the attempted crime, and an act in furtherance of the attempted crime. *See Wyatt v. State*, 24 S.W.3d 319, 323 (Tenn. 2000).

Viewing the evidence in a light most favorable to the state, we conclude that the evidence was sufficient for a rational trier of fact to convict the defendant of the first degree murder of

Graham and the attempted first degree murder of Wooten. The evidence clearly established that Harris wanted someone to kill Wooten and offered to pay someone to kill him. The defendant, along with Thomas, agreed to participate in killing Wooten. After being driven to the Oakshire Apartments, the defendant changed into black clothes, went to the area where Wooten was last seen, took a .32 automatic handgun, and fired the gun at Wooten and Graham until it was empty. Afterwards, the defendant exclaimed that he "shot that bitch." The defendant then burned his clothes and asked his girlfriend to provide an alibi for him. In sum, the evidence supports the jury's finding that the defendant's premeditated attempt to murder Wooten resulted in the murder of Graham. Accordingly, we conclude that the evidence presented at trial was sufficient to support the defendant's convictions.

### III. Sentencing

The defendant argues that the trial court erred in ordering him to serve his sentences consecutively. Citing *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), the defendant asserts that the trial court failed to find that consecutive sentencing was necessary to protect the public against further criminal conduct and reasonably related to the severity of the offenses.

Before a trial court sentences a convicted defendant, it must consider (1) the evidence received at the trial and/or sentencing hearing; (2) the presentence report; (3) the principles of sentencing; (4) the arguments of counsel relative to sentencing alternatives; (5) the nature and characteristics of the criminal conduct involved; (6) any mitigating or enhancement factors; (7) any statements made by the defendant in his or her own behalf; and (8) the defendant's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). The trial court is also required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated in determining the sentence. *Imfeld*, 70 S.W.3d at 704-05. Appellate review of a challenged sentence is a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the defendant has the burden of showing that the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401(d).

A trial court may impose consecutive sentencing upon a determination by a preponderance of the evidence that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. Therefore, pursuant to this code section, a trial court may impose consecutive sentencing if it determines that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human

life is high." Tenn. Code Ann. § 40-35-115(b)(4). If the trial court concludes that the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must also find that the consecutive sentencing reasonably relates to the severity of the offense committed and is necessary to protect the public from further serious criminal conduct by the defendant. *Imfeld*, 70 S.W.3d at 708; *Wilkerson*, 905 S.W.2d at 939.

In ordering the consecutive sentences, the trial court found that the defendant was a dangerous offender who had an extensive criminal record. Specifically, the court found that consecutive sentencing reasonably related to the severity of the offenses committed and was necessary to protect the public from further serious criminal conduct by the defendant. In making its findings the court stated:

> [T]his defendant definitely falls within that category the way he carried out this crime. Total disregard. Bullets flying. He just emptied his gun at somebody and didn't care about the fact that he hit somebody, hit the wrong person and other people were out there. The risk of a lot of human lives were at stake as was testified in court. . . .
>
> . . . .
>
> . . . Now whether or not he would be in a position to have any further criminal conduct . . . I don't know once he serves his [life] sentence. . . . [He] may or may not.
>
> But be that as it may, society would need to be protected from this defendant based on his history, his juvenile history which is extensive, on up to when he was an adult and these offenses were committed. . . .

After review, we conclude that the trial court's decision to impose consecutive sentencing is supported by the record. As the court noted, the defendant's behavior before and after firing his gun indiscriminately into a group of people in an effort to kill one of them demonstrates his indifference to human life and reflects the severity of the offense. Moreover, the defendant's past criminal history coupled with the violent circumstances surrounding this murder justify the court's finding that the defendant was dangerous to society. Accordingly, the defendant is not entitled to relief on this issue.

## IV. Conclusion

Based upon our review of the record and the parties' briefs, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE